**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT C. ASHE and JEFFREY S. GOHN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-00764-AMN-DJS |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| ARROW FINANCIAL CORPORATION, THOMAS J. MURPHY, PENKO K. IVANOV, and EDWARD J. CAMPANELLA, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiff Robert C. Ashe ("Ashe") and Plaintiff Jeffrey S. Gohn ("Gohn") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arrow Financial Corporation ("Arrow" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons

and entities other than Defendants that purchased or otherwise acquired Arrow securities between August 6, 2022 and May 12, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers.

2.      Arrow is a bank holding company that provides commercial and consumer banking, as well as financial products and services. The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ"). Accordingly, the Company is subject to the NASDAQ's listing and periodic filing requirements, including the requirement to timely file quarterly and annual reports with the SEC.

3.      During the third quarter of 2022 (mid-September 2022), Arrow implemented a new core banking system. Core banking systems are core transaction processing engines for banks, which interface with tens or hundreds of systems. Arrow was moving away from the core banking solution it had used since the 1990s to a new core system called "FIS Horizon." In connection with the conversion, internal controls over financial reporting were revised.

4.      The Individual Defendants stayed closely tuned to the progress of the core conversion. It was a major development at Arrow in 2022 and 2023, and the executives participated in regular department-head meetings where they briefed leadership on the core conversion's progress.

5.      As explained herein by a number of confidential witnesses who were former employees of the Company, the core conversion was poorly planned, Defendants rushed the core conversion process, the Company lacked sufficient personnel for the conversion, and the result

was a disaster. This created material weaknesses in the Company's disclosure controls and procedures and internal controls over financial reporting.

6.    Throughout the Class Period, Defendants made materially false and/or misleading statements and/or failed to disclose that: (i) Arrow maintained defective disclosure controls and procedures and internal controls over financial reporting; (ii) the foregoing increased the risk that the Company could not timely file one or more of its periodic financial reports with the SEC as required by the NASDAQ's listing requirements; (iii) accordingly, Arrow was at an increased risk of being delisted from the NASDAQ; (iv) following the disclosure of deficiencies in the Company's disclosure controls and procedures and internal controls over financial reporting, Arrow downplayed the severity of these issues and the associated risks; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.    On March 16, 2023, Arrow disclosed that it could not timely file its annual report on Form 10-K with the SEC for the quarter and year ended December 31, 2022 (the "2022 10-K") because "[t]he Company requires additional time to complete the assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022." Arrow also advised that it "believes that the [2022 10-K] will be filed within the extension period provided under Rule 12b-25 of the [Exchange Act], as amended."

8.    On this news, Arrow's stock price fell $0.99 per share, or 3.64%, to close at $26.21 per share on March 17, 2023.

9.    On March 31, 2023, Arrow disclosed that "it will not be able to timely file the [2022 10-K]" within the extension period provided under Rule 12b-25 of the Exchange Act, as amended. The same filing also noted that Defendants expect to disclose deficiencies in the Company's internal controls over financial reporting in the purportedly forthcoming 2022 10-K. These

included: (i) "the design and execution of controls with respect to the Company's core system including post-migration from its legacy core system Bankway to its new operating system FIS Horizon in September 2022 such as with respect to the general ledger account reconciliation process;" (ii) "the failure to design and maintain effective risk assessment process;" (iii) "the failure to design and maintain effective monitoring activities relating to providing sufficient management oversight over the internal control evaluation process to support the internal control objectives[;]" and "assessing and communicating the severity of identified deficiencies in a timely manner to those individuals responsible for taking corrective action[.]"  The Company further disclosed that "[o]nce management has completed its assessment, it may conclude that these or other deficiencies may be determined to be material weaknesses."

10.     On April 5, 2023, Arrow disclosed that, on April 3, 2023, it received a notice of non-compliance with the NASDAQ's periodic filing requirements because of the Company's failure to timely file the 2022 10-K with the SEC.

11.     On May 11, 2023, Arrow disclosed that it could not timely file its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2023 (the "1Q23 10-Q") "because the Company continued to require additional time to complete management's assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022[.]"

12.     On this news, Arrow's stock price fell $0.33 per share, or 1.66%, to close at $19.59 per share on May 12, 2023.

13.     Then, on May 15, 2023, Arrow disclosed that, on May 12, 2023, it received a second notice of non-compliance with the NASDAQ's periodic filing requirements because of the Company's failure to timely file the 1Q23 10-Q with the SEC.  Arrow also disclosed that the Company's "President and Chief Executive Officer and a member of the Board of Directors of

Arrow . . . terminated his [own] employment as President and CEO and as a director of the Company and from all other positions he holds with the Company and its affiliates, effective May 12, 2023." The timing of the second notice of non-compliance with the NASDAQ's periodic filing requirements and the CEO's self-termination left no doubt that his departure was a direct result of the core banking system disaster which led to defective disclosure controls and procedures and internal controls over financial reporting. As a result of these deficiencies, the control opinion that vouches for internal controls could not be completed and thus KPMG, the Company's auditor, was unable to complete its audit procedures. This led to the Company's inability to file its 2022 10-K and 1Q23 10-Q reports.

14.     On this news, Arrow's stock price fell $1.74 per share over two days, or 8.9%, to close at $17.85 per share on May 16, 2023.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Arrow is headquartered in this Judicial District,

Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

19.    In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

20.    Lead Plaintiff Ashe acquired Arrow securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. *See* ECF No. 1-2.

21.    Plaintiff Gohn, as set forth in his attached certification, acquired Arrow securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22.    Defendant Arrow is incorporated under the laws of New York with principal executive offices located at 250 Glen Street, Glens Falls, New York 12801. Arrow's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AROW".

23.    Defendant Edward J. Campanella ("Campanella") served as Arrow's Senior Executive Vice President ("EVP"), Treasurer, and Chief Financial Officer ("CFO") from before the start of the Class Period to September 30, 2022.

24.    Defendant Thomas J. Murphy ("Murphy") served as Arrow's President, Chief Executive Officer ("CEO") and Director of the Company at all relevant times. Defendant Murphy also served as the Company's interim CFO from September 30, 2022 (after Campanella's departure) to February 21, 2023.

25.     Defendant Penko K. Ivanov ("Ivanov") served as Arrow's CFO since February 21, 2023.

26.     Defendants Murphy, Ivanov, and Campanella are sometimes referred to herein collectively as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control the contents of Arrow's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Arrow's SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Arrow, and their access to material information available to them but not to the public, the Individual Defendants knew or were reckless in not knowing that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     Arrow and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Arrow is a bank holding company headquartered in Glens Falls, New York that provides commercial and consumer banking, as well as financial products and services. Arrow's business consists primarily of the ownership, supervision and control of Arrow's two banks, Glens Falls National Bank and Trust Company and Saratoga National Bank and Trust Company. The holding company provides various advisory and administrative services and coordinates the

general policies and operation of the banks. As of December 31, 2022, the Company had 502 full time employees at the two banks (454 at Glens Falls National Bank and Trust Company and 48 at Saratoga National Bank and Trust Company).

30.    The Company targets lending activities to consumers and small- and mid-sized companies in Arrow's regional geographic area. In addition, through an indirect lending program, Arrow acquires consumer loans from an extensive network of automobile dealers that operate in New York and Vermont. Through the banks' trust operations, the Company provides retirement planning, trust and estate administration services for individuals, and pension, profit-sharing and employee benefit plan administration for corporations.

31.    The Company's common stock trades on the NASDAQ.  Accordingly, the Company is subject to the NASDAQ's listing and periodic filing requirements, including the requirement to timely file quarterly and annual reports with the SEC.

**Core Banking Systems**

32.    According to McKinsey & Company, banks all over the world spend millions of dollars each year maintaining their "core banking systems" which are core transaction processing engines for banks, which interface with tens or hundreds of systems.  "Core banking systems handle a high volume of transactions and are expected to function without interruption – prolonged outages can invite regulatory scrutiny, customer opprobrium, and significant loss of revenue."[1]

33.    "Legacy core banking systems have traditionally succeeded in terms of reliability. Failures are rare with some banks going without an outage for months, if not years.  However,

---

[1] Vishal Dalal, Ondrej Dusek, Anand Mohanrangan, *Core Systems Strategy for Banks*, McKinsey & Co., (May 4, 2020), https://www.mckinsey.com/industries/financial-services/our-insights/banking-matters/core-systems-strategy-for-banks.

with the advent of digital banking, cloud, and APIs,[2] banks have seen a significant shift in the way banking products and partnerships are constructed.   Banks are now expected to process transactions in real time, be able to stitch together partnerships with fintech companies in a matter of weeks, release new features frequently, be able to scale (up and down) their infrastructure needs at will, and even execute on M&A quickly….   In response to these issues, a new breed of core banking systems has emerged in the last few years."[3]

**Arrow Implements a New Core Banking System**

34.     During the third quarter of 2022 (mid-September 2022), Arrow implemented a new core banking system and internal controls over financial reporting were revised in connection with this change. Arrow was moving away from the core banking solution it had used since the 1990s, "FIS Bankway," to a new core system called "FIS Horizon." Arrow stated that the new core system would enable future enhancements to the Company's digital experience, improve efficiency for Arrow and its customers, and empower data-driven decisions.

35.     Confidential Witness ("CW")-1 worked as Arrow's Bank Secrecy Act ("BSA") and Fraud Specialist from February 2022 to July 2023.   CW-1 was based at the Company's headquarters in Glens Falls, New York and reported to Saratoga National Bank & Trust Company Assistant Vice President/BSA/AML Officer Colleen Murray, who reported to Director of Compliance and Risk Leslie Munger.

36.     According to CW-1, Defendants Murphy, Campanella, and Ivanov closely scrutinized progress of the core conversion.[4]  It was the most important development at Arrow in

---

[2] "APIs" refers to application programming interface.  APIs are mechanisms that enable two software components to communicate with each other using a set of definitions and protocols.
[3] *Core Systems Strategy for Banks*, *supra* note 1.
[4] Murphy and Campanella were closely involved in the preparation for the core conversion, and Murphy kept close tabs on the conversion process, according to CW-6 who worked at the Company

2022 and 2023, and the executives participated in regular department-head meetings where they briefed leadership on the core transition's progress.[5]

37.     CW-8 worked as an associate at Glens Falls National Bank & Trust Co. in Glens Falls, New York from September 2017 to September 2023.  Prior to that, CW-8 was a deposit services representative at the bank from September 2016 to September 2017.  CW-8's supervisor was Glens Falls National Bank AVP Deposit Operations Manager Melissa Lyman, who reported to VP and Director of Deposit and Loan Services Wendy Lanzone.

38.     CW-8 stated that Murphy and Ivanov were well-informed throughout the conversion process.  They received daily reports following the conversion.  According to CW-8, the executives, including Murphy and Ivanov, held daily update calls post-core conversion where operations leadership briefed them on the latest developments.  "I would imagine they would know [about the problems created by the conversion]," CW-8 stated.  "They were pretty in tune with what was going on."

**Defendants Rushed the Core Conversion Process, Lacked Sufficient Personnel, and the Result Was a Disaster**

39.     Defendants rushed the core conversion process. Although the original plan was to launch the new core banking system in the Spring of 2022, Defendants pushed the conversion to the Fall of 2022 after it became abundantly clear that the Company was not ready to launch. Integrations were not on track to finish on time and employees still needed to learn the new system in preparation for the conversion.

_____

as a public relations and communications manager from October 2019 to August 2022, was based in Glens Falls, New York at the Company's headquarters, reported to Senior Vice President Director of Marketing Blake Jones, and was at the bank as it prepared for the core conversion.
[5] CW-7, who was a VP Senior Administration Manager from May 2018 to March 2022 and worked at the Company's headquarters, stated: "The executives stayed abreast [about the core conversion process] – there were periodic meetings at least monthly if not weekly or biweekly."

40.     CW-2 is an Arrow former employee who worked in Systems from June 2021 to April 2023. CW-2 was based in Glenn Falls and reported to Wendy Brust ("Brust"), Senior Vice President and Director of Information Systems and Support.  Brust's supervisor was Arrow EVP and Chief Information Officer ("CIO") Michael Jacobs ("Jacobs").

41.     CW-2 was responsible for all reports that formed the backbone of Arrow's two subsidiary banks, Glenn Falls National Bank and Trust Company and Saratoga National Bank and Trust Company. "I wrote all the reports, which are used on a daily basis, and all the extract files for internal and external data."

42.     According to CW-2, Arrow told employees that the core conversation was the most significant undertaking the bank had ever gone through.  Notwithstanding, CW-2 stated that Arrow rushed the core conversion process leading to myriad problems with the bank's essential reporting functions.  CW-2 stated: ***"A lot went wrong" during the conversion.  "I don't even know where to start."  "We had a lot of false data issues."***

43.     In the lead up to the conversion, Arrow tasked CW-2 and his colleague with rewriting all the reports over the three months leading up to the September 2022 core conversion. "I rewrote thousands of reports that were used daily, monthly, or weekly."  "All the internal tools needed to be restructured, the data needed to be validated, and the reports needed to be validated." The reports CW-2 and his colleague rewrote included reports used for financials.  "It was basically starting from square one, or that's what it felt like."

44.     From CW-2's perspective, "[t]here was no leadership … for the systems side of the bank."  "There was no one I could go to with questions or concerns."  Management was "pretty lost in the sauce" and CW-2 and his colleague did not have any direction.  No one at Arrow took the time to figure out which reports were essential and which could be sidelined until later.  In

August 2022, just before the core conversion in mid-September 2022, CW's managers came to him and suggested that "instead of rewriting everything now, let's redo the priority list of what we need for the conversion." But CW-2 and his coworker, who had advised the same four months earlier, were too close to the deadline to complete even a crucial list of reports at that point as the conversion was imminent. CW-2 and his colleagues never received a single master list of essential reports to complete.

45.      CW-2 knew from the start that Arrow did not allot enough time or personnel for the core conversion. Over the summer of 2022, CW-2 worked 15-hour days and repeatedly warned Brust and Jacobs that they needed more time, but they were not responsive to CW-2's concerns. CW-2 stated that neither Brust nor Jacobs seemed to understand how long it took to code and how wrong things could go if they rushed the process. "Some of the reports had hundreds of fields." "I told [Brust and Jacobs] there was not enough time and resources for us to do things the way they wanted" and CW-2 was sure the C-suite executives were aware.

46.      CW-2 and his colleague were first given access to the new reporting service in June 2022 – just three months before the mid-September go-live date. "We only had [the time] between [the] go-live date and having access to our new reporting service to rewrite and redo thousands of things." CW-2 explained that the time allotted was inadequate to prepare for the conversion.

47.      In fact, many reports were not ready by the go-live date in mid-September 2022. "By the time . . . we went live [in mid-September 2022], we were still writing reports and still doing things that were required" for the bank to function correctly. "For instance, collateral files that we would send to a vendor to collateralize certain loans – that wasn't even done until a week after the conversion."

48.     CW-2 was not surprised when Arrow filed its financials late. According to CW-2, the reporting issues stemmed from the fact that when CW-2 was given the task of converting the bank's reports, there were just too many of them, and too few people to write the new reports. "Some of those reports were for financial information that would calculate collateral and such." "Some of those reports pulled information for tax stuff, and for things that they would relay to the board and things that they would use to pull information for filing their taxes." Arrow's top leadership knew the issue but didn't change direction. *"They didn't change their plan – there was no plan,"* CW-2 stated (emphasis added). "The plan was to survey as quickly and as fast as possible, which then caused issues down the line because *we were forced to write these as quickly as possible" with "massively inadequate" quality assurance.* "It was a constant thing of 'oh, you just got to move on to the next one, you just got to move on to the next one.'" (Emphasis added.)

49.     When the September go-live date arrived, CW-2 and his colleague were scrambling, returning to reports they had already written and rewriting them.

50.     CW-2 stated that the Company also faced issues with vendor integrations after the core conversion. "We found issues with the core itself; data was missing" and "I probably found 20 things that were converted wrong by our vendor." When third-party vendors pulled a query, the mapping was incorrect. "That was just me finding 20 to 25 things," CW-2 stated. "*I brought these issues up a million times; I was like, 'I keep finding issues.'"* (Emphasis added.) According to CW-2, *he began discovering issues the second he was granted access to the Company's new portal in June 2022. "I was finding issues early on and pointing them out." "They were like, 'just keep rewriting reports.'"* (Emphasis added.)

51.     CW-2 relayed the issues to Brust and CIO Jacobs, but his concerns were not taken seriously. CW-2 believes that Defendants Campanella and Murphy would have received reports

about the problems IT faced from CIO Jacobs who was responsible for relaying information from IT to the rest of the C-suite.  According to CW-2, it was Jacobs' responsibility to "relay stuff higher up the chain."

52.    According to CW-1 (previously identified as a BSA and Fraud Specialist from February 2022 to July 2023), after the conversion, "[t]hings didn't work."  Transaction codes had been mixed up during the transfer, causing CW-1 and her team to fall far behind.  "Reports we should have generated didn't generate."  Alerts generated "times four" erroneously.  CW-1's office had a six-month backlog of federally mandated filings.  "Normally, you'd be one week behind," CW-1 said.  "One or two months at most."

53.    According to CW-1, everyone at Arrow was "well aware" of the challenges the core conversion posed.  "Our management was well aware." Murphy "was making necessary decisions" and served as the ultimate decision-maker during CW-1's tenure.

54.    CW-3 worked as a loan services manager at Arrow's Glens Falls National Bank from June 2021 to April 2023, and was based in Glens Falls, New York at the main branch.

55.    CW-3 confirmed that the core conversion date was originally scheduled for earlier in the year but was pushed back to September 2022 because it became clear in the Spring of 2022 that Arrow was nowhere near ready to switch to the new core banking system.  According to CW-3, CFO Campanella and CEO Thomas had to understand that bank employees were scrambling as the core conversion approached in September 2022. After all, they had already pushed the conversion back once, and nothing had changed.  Everyone at the bank was still struggling to feel comfortable with the new system as the core conversion approached.  "It was a basic consensus with everybody." "There was no time – everybody felt it, nobody had time [to prepare]." CW-3

emphasized that "it wasn't like it was only a small group that was stressed, everybody was like, 'how are we going to do this? How is it going to happen?'"

56.     CW-3 stated that Arrow's core conversion was not CW-3's first conversion. CW-3 had dealt with similar shifts at banks in the past. However, Arrow's lack of lead time and the Company's operations complexity made the situation more precarious. In essence, Arrow performed two core conversations, one for Glens Falls National Bank and Trust Company and another for Saratoga National Bank and Trust Co. The top executives at the Company didn't seem to fully appreciate "how much it was to manage." "Everybody was involved in the conversations" and the response from management was "it'll make sense when we do it." The hope trickling down from senior management was that everything would come together when Arrow's new core conversion went live. "And then that didn't happen. [Things didn't come together] for the better part of a year." And the bank still wasn't back up and operating as usual when CW-3 left in April 2023. "It had never really come together." "They never reported financials until midway through [2023] . . . and we converted in the third quarter of 2022."

57.     After the disastrous core conversion in mid-September 2022, *there was no way the executives weren't soon aware that the bank's financial reporting was in shambles*. CW-3 stated: "I can't imagine they weren't aware."

58.     CW-3 stated: "One of the major things was the reporting wasn't the same between cores, so we were reporting one way on our old system, and then the new reports generated out of the new core were not reporting the same way."

59.     Loans were categorized differently in the two systems, and Arrow didn't learn that until it converted to the new system. "We had to convert our loans over to the new core system, and it was not apples to apples; it was apples to oranges," CW-3 stated. "You couldn't just keep

using the same reports you used previously and keep reporting the same way." The "core itself was different," and the reports no longer worked.

60.     It was challenging for Arrow to assess what was going on, let alone correct the issues. The bank staff had to figure out how to convert, build and write new reports for everything that they did. "There was just so many moving pieces going on that it was very difficult to figure out how to do that." "It was just very chaotic and incredibly stressful" and employees started leaving in droves. CW-3 stated that Murphy and the other leaders had to know that employees were leaving the bank in droves. The Company wasn't so large that the turnover could go unnoticed. As previously stated, as of December 31, 2022, the Company had 502 full time employees at the two banks (454 at Glens Falls National Bank and Trust Company and 48 at Saratoga National Bank and Trust Company).

61.     CW-4 worked as an internal auditor at Arrow from around October 2022 (after the core conversion) to June 2023. CW-4 was part of a five-six-person audit term under Senior Vice President and Director of Internal Audit Mark Wolfenden at Arrow's Glens Falls, New York headquarters.

62.     According to CW-4, the core conversion may have introduced general ledger ("GL") errors. CW-4 noticed some abnormal numbers that pointed to deficiencies in internal controls during his tenure. CW-4 stated: "I was working on a project where we were looking at the general ledger and it just didn't seem like things were tying out as cleanly as they should be." Without recalling any specific numbers that shifted, CW-4 stated that the GL numbers had switched from, for instance, 17000 in August 2022 to 42000 in September 2022. A shift from a GL account number beginning with "1" to a number starting with a "4" could cause Arrow to treat an asset account as a liability account in a financial report.

63.     According to CW-4, Arrow terminated Wolfenden in or about March or April 2023 for unknown reasons.  His sudden departure was on or about the time Arrow announced it could not report its financials on time. "We were just told that he was let go."  CW-4 left Arrow in June 2023 out of fear that the bank's tarnished reputation could impact his career.

64.     CW-5 worked as Arrow's quality assurance, training and operations team lead from July 2022 to April 2023, and was based at Arrow's headquarters in Glenn Falls, New York.  CW-5 reported to Glens Falls National Bank & Trust Co. Associate and Deposit Services Representative David Rizzo ("Rizzo") and Glen Falls National Bank AVP Deposit Operations Manager Melissa Lyman ("Lyman").  Lyman reported to VP and Director of Deposit and Loan Services Wendy Lanzone ("Lanzone").

65.     According to CW-5, the core conversion triggered numerous problems.  CW-5 started noticing problems as soon the bank completed the three-day core conversion process in mid-September 2022 and alerted Rizzo, Lyman and Lanzone.

66.     One of the first problems CW-5 noticed was that after the core conversion, debit card fraud reports were not populating correctly. Additionally, customers weren't getting their money when they were supposed to.  "We were getting massive complaints from customers [that] fraudulent charges on accounts weren't recovered, etc." "We were losing customers."  When CW-5 escalated this concern to Lanzone, she said she was aware of the issue but could not do much.

67.     CW-5 stated that after the conversion, things were a mess at Arrow.  "I'm like, this is people's money," explaining how little her managers seemed to care.

68.     According to CW-5, "I think what happened with the core conversion was poor planning, trying to get everybody set up with their tasks and reports, and ensuring that customer documentation was kept secure."

69.     The fallout was costly for the bank, both financially and operationally.  Many employees quit the bank, CW-5 stated, placing even more demands on those who remained after the conversion.  Soon, the bank struggled with customer retention and faced internal upheaval, including layoffs.

70.     CW-5 stated that the Company could not report its financials on time following the core conversion and this delay sparked an internal investigation into financial reporting failures. "It made us look like a fake bank," CW-5 stated.  "And I just remember Tom Murphy saying, … 'Oh, we were unable to get our reports ready on time….'"

71.     CW-5 stated that Arrow fell months behind in generating accurate reports.  "We had to do a lot of backtracking to ensure we got our proper reports, and we were behind months by the time I left the [C]ompany – it was such a mess!"

72.     CW-5 stated that another problem resulting from the core conversion prevented Saratoga National Bank and Trust Co. from issuing IRS 1099 forms for its high-yield savings account holders.  The 1099 forms were legally required to be sent by January 31 for accounts accruing over $600 in interest, but that did not happen.  Arrow only became aware of the issue when customers began to complain. According to CW-5, at the end of January 2023, Rizzo was talking about an IRS penalty the bank was facing due to its failure to populate and issue 1099s to its customers.  "I remember David talking about it.  We had a penalty we had to pay; we got some type of extension, but we had to get them out."

73.     Confronted with IRS penalties, the bank manually processed all the 1099 forms. The process was inefficient and fraught with potential for errors.  Arrow mobilized staff to insert the forms into envelopes and mail them.  Arrow addressed the 1099 crisis around Presidents' Day in February 2023.

74.    Asked whether the executives at the bank would have been aware of the problems issuing the 1099s, CW-5 stated: "There's no way that they didn't receive reports."  "I remember there was an email from the head of accounting or my manager Melissa [Lyman]. The email said there was an error in the core conversion, and the 1099s were not populated."  The email assured employees that Arrow was "working to resolve this issue," but the bank didn't resolve the problem rapidly enough.

75.    Additionally, the dispute reports test was a test that kept failing after the core conversion.  According to CW-5: "The reports had been incorrect for six months, and this was something I had told management about the entire time since [the] core conversion." CW-5 had long known the reports were wrong because CW-5 would pull them and see no disputes or refunds, which was impossible.  "And I couldn't balance it."  "And customers weren't getting their refunds, they weren't getting their money back."  "They didn't feel like their accounts and money were secure with our bank, and I don't blame them."

76.    CW-5 also stated that after the core conversion, there were problems with the bank's process for returning Social Security payments that were deposited into the accounts of deceased account holders.  The process in question ensured that when a customer died and received a Social Security payment posthumously, Arrow would promptly return the payment to the Social Security Administration. The process demanded diligent monitoring of customer accounts because a daily fee accrued until Arrow returned the money to the agency.  But after the core conversion, the process was not compliant with the new system. Arrow had not updated the procedure post-core conversion.  "We're having Social Security checks going into people's accounts, and we're not following up on it."

77.     According to CW-5, employees did not receive training after the core conversion. They were left in the dark as to how to do tasks and this affected customer retention. The bank lost "a lot of customers." "I was in quality, so I could see the non-compliance written on the wall." "I was bringing it to management's attention, and they didn't want to do anything about it."

78.     According to CW-8 (previously identified as an associate at Glens Falls National Bank & Trust Co. from September 2017 to September 2023), after the conversion, it quickly became apparent that the conversion had introduced myriad errors into Glens Falls National Bank & Trust Co.'s account reconciliation process and other crucial functions. "Overall, [the core conversion] was pretty messy." "There was a lot of fallout where things weren't working properly afterward." The bank struggled to reconcile customer accounts and reassure customers that their money was safe. "There was a lot of negative customer impact with different things." As problems stemming from the core conversion spiraled in the fall of 2022, Murphy and Ivanov had to be aware. As previously stated, they received daily reports following the conversion where operations leadership briefed them on the latest developments.

**Defendant Campanella Resigns in the Lead Up to the Core Conversion**

79.     On August 26, 2022, the Company announced that CFO Campanella resigned as Arrow's Senior EVP, Treasurer, and CFO, effective September 30, 2022. Simultaneously, the Board of Directors of the Company appointed Defendant Murphy as Arrow's interim Treasurer, CFO, and Principal Accounting Officer, in addition to his role as CEO. (Murphy served in this additional role until the Company hired Defendant Ivanov as its Senior EVP, CFO, Treasurer and Chief Accounting Officer of Arrow and its two bank subsidiaries, effective February 21, 2023.)

80.     Although the Company disclosed that Defendant Campanella's departure was for "personal reasons," the timing makes it likely that his departure was related to the core conversion.

81.     According to CW-5, Arrow had "a lot of non-compliance" which may have impacted Campanella's abrupt exit.  There was an "awkward situation" involving Campanella where an email went out to staff stating that "effective today, he is longer with the [C]ompany."

**Arrow Fails to File its Annual Report on Time and Receives its First Notice of Non-Compliance with NASDAQ's Periodic Filing Requirements**

82.     On March 16, 2023, Arrow disclosed that it could not timely file its 2022 10-K with the SEC because the Company required additional time to complete the assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022.  It also disclosed that it believed that the 2022 10-K would be filed within the extension period provided under Rule 12b-25 of the Exchange Act.[6]

83.     On this news, Arrow's stock price fell $0.99 per share, or 3.64%, to close at $26.21 per share on March 17, 2023.

84.     On March 31, 2023, the Company disclosed that it would not be able to file its 2022 10-K within the extension period (which ended that day) and continued to require additional time to complete management's assessment of the effectiveness of internal controls over final reporting as of December 31, 2022.  It further disclosed that even though management's assessment was not completed, it had already identified deficiencies in the Company's internal controls over financial reporting in the 2022 10-K.  These included: (i) "the design and execution of controls with respect to the Company's core system including post-migration from its legacy core system Bankway to its new operating system FIS Horizon in September 2022 such as with respect to the general ledger account reconciliation process;" (ii) "the failure to design and maintain effective risk assessment process;" (iii) "the failure to design and maintain effective monitoring activities relating to . . .

---

[6] The filing of SEC Form 12b-25 provides the issuer with 15 additional calendar days to file a late 10-K. *See* 17 CFR 240.12b-25.

providing sufficient management oversight over the internal control evaluation process to support the internal control objectives[;]" and . . . "assessing and communicating the severity of identified deficiencies in a timely manner to those individuals responsible for taking corrective action[.]" The Company further disclosed that "[o]nce management has completed its assessment, it may conclude that these or other deficiencies may be determined to be material weaknesses."

85.     On April 5, 2023, the Company disclosed that it received a notice of non-compliance with the NASDAQ's periodic filing requirements because of the Company's failure to timely file the 2022 10-K with the SEC.

**Arrow Fails to File its Quarterly Report on Time, Receives a Second Notice of Non-Compliance with NASDAQ's Filing Requirements, and Defendant Murphy Terminates His Own Employment**

86.     On May 11, 2023, during after-market hours, Arrow disclosed the Company's inability to file its 1Q23 10-Q with the SEC for the quarter ended March 31, 2023.

87.     On this news, Arrow's stock fell $0.33 per share, or 1.66%, to close at $19.59 per share on May 12, 2023.

88.     On May 15, 2023, during pre-market hours, Arrow disclosed that, on May 12, 2023, it received a second notice of non-compliance with the NASDAQ's periodic filing requirements because of the Company's failure to timely file the 1Q23 10-Q with the SEC.  Arrow also disclosed that Defendant Murphy, the Company's President and Chief Executive Officer and a member of the Board of Directors of Arrow "terminated his employment as President and CEO and as a director of the Company and from all other positions he holds with the Company and its affiliates, effective May 12, 2023."

89.     The timing of the second notice of non-compliance with the NASDAQ's periodic filing requirements and Murphy's self-termination left no doubt that Murphy's departure was a

direct result of the core banking system disaster which led to defective disclosure controls and procedures and internal controls over financial reporting. As a result of these deficiencies, the control opinion that vouches for internal controls could not be completed and thus KPMG, the Company's auditor, was unable to complete its audit procedures. This led to the Company's inability to file its 2022 10-K and 1Q23 10-Q reports.

90.    Analyst Piper Sandler issued a "Hot Comment" on May 15, 2023, stating it presumed that Murphy's departure was "related to the internal control deficiencies, and the company's inability to file its 10K."

91.    CW-3 believes that Arrow may have pushed Murphy out due to the core conversion debacle, which led to the Company's inability to file its 2022 10-K and 1Q23 10-Q reports.

92.    On this news, Arrow's stock price fell $1.74 per share over two days, or 8.9%, to close at $17.85 per share on May 16, 2023.

93.    On July 18, 2023, the Company finally filed its 2022 10-K which stated:

Arrow relies extensively on information systems and technology to manage the Company's business and summarize operating results. During September 2022, Arrow completed the implementation of a new core banking system which replaced the prior system…. This upgrade constitutes a major investment in Arrow's technology needs and is a key initiative within its strategic plan. The new core system implementation process has required, and will continue to require, the investment of significant personnel and financial resources. We are now using the new core system. In connection with the conversion, we have encountered, and are continuing to experience, operational and other issues, certain of which have required substantial time and resources to address, and which have had a negative impact on our operations and business and have contributed to the material weaknesses in the Company's internal controls described in Part II, Item 9A, *Controls and Procedures*.

94.    The 2022 10-K also stated that Arrow's CEO and CFO "concluded that as of December 31, 2022, our disclosure controls and procedures were not effective due to a material weakness in internal controls over financial reporting…." It further stated:

[W]e have identified material weaknesses in our system of internal controls. Specifically, in connection with management's evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2022, we determined that we did not maintain effective monitoring controls in relation to testing, communication, and oversight over internal controls over financial reporting. Also, with regard to the conversion of our core banking information technology system, we did not effectively perform risk assessment procedures to identify the impact of the conversion on our internal control over financial reporting.

95.    According to the Company, "the material weaknesses could result in a misstatement of certain account balances or disclosures that could result in a material misstatement to the annual or interim financial statements which would not be prevented or detected in a timely manner."

**Materially False and Misleading Statements Issued During the Class Period**

96.    The Class Period begins on August 6, 2022, the day after Arrow filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants Murphy and Campanella, in their capacities as President and CEO and Senior EVP, Treasurer and CFO, respectively. With respect to Arrow's disclosure controls and procedures and internal control over financial reporting, the 2Q22 10-Q stated, in relevant part (emphasis added):

Senior management, including the [CEO] and [CFO], has evaluated the effectiveness of the design and operation of Arrow's disclosure controls and procedures (as defined in Rule 13a-15(e) under the [Exchange Act], as amended) as of June 30, 2022. ***Based upon that evaluation, senior management, including the [CEO] and [CFO], concluded that disclosure controls and procedures were effective. Further, there were no other changes in Arrow's internal control over financial reporting that occurred during the quarter ended June 30, 2022, that materially affected, or are reasonably likely to materially affect, Arrow's internal control over financial reporting.***

97.    Appended as an exhibit to the 2Q22 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), wherein Defendants Murphy and Campanella, in their capacities as CEO and CFO, respectively, certified (i) that the 2Q22-10-Q ***"does not contain any***

*untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;"* and that they (ii) "[e]valuated the effectiveness of [Arrow's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures…[;]" and (iii) *disclosed "any change in [Arrow's] internal control over financial reporting that occurred during [Arrow's] most recent fiscal quarter … that has materially affected, or is reasonably likely to materially affect, [Arrow's] internal control over financial reporting."* (Emphasis added.)

98.    Despite the foregoing assurances, the 2Q22 10-Q also provided generic, boilerplate risk warnings regarding "[p]otential [c]omplications with the implementation of our new core banking system [that] *could* adversely impact our business and operations" (emphasis added).  In particular, the 2Q22 10-Q stated, in relevant part (emphasis added):

> We rely extensively on information systems and technology to manage our business and summarize operating results. We are in the process of implementing a new core banking system to replace our existing system…. This upgrade is a major investment in Arrow's technology needs and is a key initiative within our strategic plan. The new core system implementation process has required, and will continue to require, the investment of significant personnel and financial resources. *We may not be able to successfully implement the new core system without experiencing delays, increased costs and other operational difficultie*s. *If we are unable to successfully implement the new core system as planned, our operations, financial positions, results of operations and cash flows could be negatively impacted. Additionally, if we do not effectively implement the new core system as planned or the new core system does not operate as intended, the effectiveness of our internal control over financial reporting could be adversely affected or our ability to assess those controls adequately could be delayed or diminished.*

99.    On November 7, 2022, Arrow filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "3Q22 10-Q").   This was Arrow's first quarterly report following Defendant

Campanella's resignation as Senior EVP, Treasurer and CFO. The 3Q22 10-Q was signed by Defendant Murphy in his capacity as President, CEO and Interim CFO. With respect to Arrow's disclosure controls and procedures and internal control over financial reporting, the 3Q22 10-Q stated, in relevant part (emphasis added):

> Senior management, including the [CEO] and Interim [CFO], has evaluated the effectiveness of the design and operation of Arrow's disclosure controls and procedures (as defined in Rule 13a-15(e) under the [Exchange Act], as amended) as of September 30, 2022. ***Based upon that evaluation, senior management, including the [CEO] and Interim [CFO], concluded that disclosure controls and procedures were effective.***

100. In addition, the 3Q22 10-Q disclosed that "[d]uring the quarter ended September 30, 2022, Arrow implemented a new core banking system and internal controls over financial reporting were revised in connection with this change." With respect to this change to the Company's internal control over financial reporting, the 3Q22 10-Q assured investors that ***"Arrow's pre- and post-implementation internal controls over financial reporting were both evaluated by management and deemed to be operating effectively"*** and that ***"there were no other changes in Arrow's internal control over financial reporting that occurred during the quarter ended September 30, 2022, that materially affected, or are reasonably likely to materially affect, Arrow's internal control over financial reporting."*** (Emphasis added.)

101. Despite the foregoing assurances, the 3Q22 10-Q also provided generic, boilerplate risk warnings regarding "[p]otential [c]omplications with the implementation of our new core banking system [that] ***could*** adversely impact our business and operations" (emphasis added). In particular, the 3Q22 10-Q stated, in relevant part (emphasis added):

> During September 2022, Arrow completed the implementation of a new core banking system which replaced the prior system…. This upgrade constitutes a major investment in Arrow's technology needs and is a key initiative within its strategic plan. The new core system implementation process has required, and will continue to require, the investment of significant personnel and financial resources.

> We are now using the new core system. ***We encountered some limited issues and worked to minimize any inconvenience to customers***, but there can be no assurance that such issues will not arise in the future.

Plainly, the foregoing risk warning was a generic, catch-all provision that was not tailored to Arrow's actual known risks regarding deficiencies inherent in the design and execution of its controls following the migration from its legacy core system to its new operating system. Describing the issues as "limited" was inaccurate in light of the facts described herein by various CWs. *See, e.g.*, ¶¶ 42-51 (CW-2) (*"A lot went wrong" during the conversion. "I don't even know where to start." "We had a lot of false data issues." "We found issues with the core itself; data was missing" and things "were converted wrong by the vendor."*); ¶¶ 52-53 (CW-1) (after the conversion, *"[t]hings didn't work."* Transaction codes had been mixed up during the transfer, causing CW-1, a BSA and Fraud Specialist, to fall far behind. *"Reports we should have generated didn't generate." Alerts generated "times four" erroneously. CW-1's office had a six-month backlog of federally mandated filings because of the conversion*); ¶ 62 (CW-4) (*the core conversion may have introduced general ledger errors*; CW-4 noticed some abnormal numbers that pointed to *deficiencies in internal controls*); ¶¶ 66-77 (CW-5) (after the conversion, *debit card fraud reports were not populating correctly and fraudulent charges on accounts weren't recovered, IRS 1099 forms were not issued on time for high-yield savings account holders causing the bank to pay a penalty, dispute report tests kept failing, and there were problems with the bank's process for returning Social Security payments that were deposited into the accounts of deceased account holders*); ¶ 78 (CW-8) (after the conversion, *it quickly became apparent that the conversion had introduced myriad errors into Glens Falls National Bank & Trust Co.'s account reconciliation process and other crucial functions.*).

102.    Appended as an exhibit to the 3Q22 10-Q were signed certifications pursuant to SOX, wherein Defendant Murphy, in his capacity as CEO and Interim CFO, certified (i) that the 3Q22-10-Q ***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*** and that he (ii) "[e]valuated the effectiveness of [Arrow's] disclosure controls and procedures and presented in this report [his] conclusions about the effectiveness of the disclosure controls and procedures…[;]" and (iii) ***disclosed "any change in [Arrow's] internal control over financial reporting that occurred during [Arrow's] most recent fiscal quarter … that has materially affected, or is reasonably likely to materially affect, [Arrow's] internal control over financial reporting."*** (Emphasis added.)

103.    The statements referenced in ¶¶ 96-102 were materially false and/or misleading statements and/or failed to disclose that: (i) Arrow maintained defective disclosure controls and procedures and internal controls over financial reporting; (ii) the foregoing increased the risk that the Company could not timely file one or more of its periodic financial reports with the SEC as required by the NASDAQ's listing requirements; (iii) accordingly, Arrow was at an increased risk of being delisted from the NASDAQ; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

104.    On March 16, 2023, during after-market hours, Arrow filed a notification of late filing on Form 12b-25 with the SEC (the "Late 2022 10-K Notice"), signed by Defendant Murphy in his capacity as President and CEO, disclosing the Company's inability to timely file the 2022 10-K with the SEC.  Specifically, the Late 2022 10-K Notice stated, in relevant part:

Arrow . . . is unable to file its [2022 10-K] within the time period prescribed without unreasonable effort or expense. The Company requires additional time to complete the assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022. As a result of the foregoing, KPMG LLP, the Company's independent registered accounting firm, has not yet completed its audit procedures.

105.    On this news, Arrow's stock price fell $0.99 per share, or 3.64%, to close at $26.21 per share on March 17, 2023.  Despite this decline in the Company's stock price, Arrow securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the severity of the Company's deficient internal controls and their impact on the Company's ability to timely file its periodic financial reports with the SEC, as required by the NASDAQ's listing requirements.

106.    For example, the Late 2022 10-K Notice stated, in relevant part, that ***"the Company believes that the [2022 10-K] will be filed within the extension period provided under Rule 12b-25 of the [Exchange Act], as amended, but can provide no assurance that it will be able to file by such time."*** (Emphasis added.)  (But the extension period was only for 15 days and ended on March 31, 2023.  The Company did not file its 2022 Form 10-K until eight months later on November 18, 2023.)

107.    On March 31, 2023, Arrow filed an amended notification of late filing on Form 12b-25/A with the SEC (the "Amended Late 2022 10-K Notice"), signed by Defendant Ivanov in his capacity as CFO, stating, in relevant part (emphasis added):

The Company has now determined that it will not be able to timely file the [2022 10-K] by March 31, 2023 . . . .

The Company continues to require additional time to complete management's assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022. Although management's assessment is not complete, management has identified and expects it will disclose deficiencies in the Company's internal controls over financial reporting in the 2022 Form 10-K, including the following: (i) the failure to design and maintain an effective risk assessment process; (ii) the failure to design and maintain effective monitoring

activities relating to (a) providing sufficient management oversight over the internal control evaluation process to support the internal control objectives, and (b) assessing and communicating the severity of identified deficiencies in a timely manner to those individuals responsible for taking corrective action; and (iii) the design and execution of controls with respect to the Company's core system including post-migration from its legacy core system Bankway to its new operating system FIS Horizon in September 2022 such as with respect to the general ledger account reconciliation process. ***Once management has completed its assessment, it may conclude that these or other deficiencies may be determined to be material weaknesses***. As a result of the foregoing, KPMG LLP, the Company's independent registered accounting firm, has not yet completed its audit procedures.

108.    Despite the foregoing, the Amended Late 2022 10-K Notice also assured investors, in relevant part (emphasis added):

The Company is working diligently to file the [2022 10-K] as soon as practicable.

* * *

[T]he Company does not expect any material change to the financial results included in the [2022 10-K] compared to those included in the Company's earnings press release furnished to the Securities and Exchange Commission under the Company's Current Report on Form 8-K filed January 30, 2023 ("January Form 8-K"). Please refer to the January Form 8-K for a comparison of the results of operations for the fiscal year ended December 31, 2022 as compared to the fiscal year ended December 31, 2021. For the avoidance of doubt, the Company does not expect that the identified deficiencies will result in material misstatements or omissions in its previously reported financial statements or that the Company will have to restate its previously reported financial information.

109.    Five days later, on April 5, 2023, Arrow filed a current report on Form 8-K with the SEC, signed by Defendant Ivanov in his capacity as CFO, disclosing that the Company had received a notice from the NASDAQ on April 3, 2023, which stated that the Company was noncompliant with the periodic filing requirements for continued listing on the NASDAQ. The Form 8-K stated, in relevant part:

On April 3, 2023, Arrow . . . received a notice from the Listing Qualifications Department of The NASDAQ Stock Market LLC ("Nasdaq") that the Company is noncompliant with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of its failure to file its [2022 10-K] with the [SEC] by the required due date (the "Nasdaq Notice").

As previously reported by the Company in its [Late 2022 10-K Notice], filed with the SEC on March 16, 2023, as amended [i]n [the Amended Late 2022 10-K Notice], the Company was unable to timely file the [2022 10-K] without unreasonable effort or expense. The Company intends to submit the [2022 10-K] as soon as practicable.

The Company is required to submit a plan, within 60 calendar days of receiving the Nasdaq Notice, or by June 2, 2023, which outlines the steps the Company expects to take to become compliant with the Rule. If Nasdaq accepts the Company's plan, Nasdaq may grant an exception of up to 180 calendar days from the due date of the [2022 10-K], as extended by Rule 12b-25, or by September 27, 2023, to regain compliance. However, there can be no assurance that Nasdaq will accept the Company's plan to regain compliance or that the Company will be able to regain compliance within any extension period granted by Nasdaq. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel.

The Nasdaq Notice has no immediate effect on the listing or trading of the Company's shares of common stock, though Nasdaq will broadcast an indicator over its market data dissemination network noting the Company's noncompliance. If the Company remains noncompliant with the Rule at the end of the 180-day exception period, the Company's shares of common stock will be subject to delisting from Nasdaq.

110.    The statements referenced in ¶¶ 106-109 were materially false and/or misleading statements and/or failed to disclose that: (i) the Company could not timely file the 1Q23 10-Q with the SEC as required by the NASDAQ's listing requirements; (ii) accordingly, Arrow was at an increased risk of being delisted from the NASDAQ; (iii) Arrow downplayed the severity of its defective disclosure controls and procedures and internal controls over financial reporting, as well as the risks inherent in those defective controls; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

111.    On May 11, 2023, during after-market hours, Arrow filed a notification of late filing on Form 12b-25 with the SEC (the "Late 1Q23 10-Q Notice"), signed by Defendant Ivanov in his capacity as CFO, disclosing the Company's inability to timely file the 1Q23 10-Q with the SEC. Specifically, the Late 1Q23 10-Q Notice stated, in relevant part:

Arrow . . . will be unable to file its [1Q23 10-Q] within the time period prescribed without unreasonable effort or expense.

The Company previously filed [the Late 2022 10-K Notice] on March 16, 2023, as amended [i]n [the Amended Late 2022 10-K Notice], disclosing that the Company would be unable to file its [2022 10-K] within the time period prescribed, as extended by Rule 12b-25 under the [Exchange Act], as amended ("Rule 12b-25"), without unreasonable effort or expense because the Company continued to require additional time to complete management's assessment of the effectiveness of internal controls over financial reporting as of December 31, 2022 (the "Assessment").

As the Company has yet to file the [2022 10-K], the Company will be unable to timely file the [1Q23 10-Q].

. . . . As a result of the foregoing, KPMG LLP, the Company's independent registered accounting firm, has not yet completed its audit procedures with respect to the [2022 10-K] and review procedures with respect to the [1Q23 10-Q].

112.    On this news, Arrow's stock price fell $0.33 per share, or 1.66%, to close at $19.59 per share on May 12, 2023.  Despite this decline in the Company's stock price, Arrow securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the severity of the Company's deficient internal controls and their impact on the Company's ability to timely file its periodic financial reports with the SEC, as required by the NASDAQ's listing requirements.

113.    For example, the Late 1Q23 10-Q Notice continued to assure investors, in relevant part, that "[t]he Company is working diligently to complete the Assessment and file the [2022 10-K] and the [1Q23 10-Q] as soon as practicable" and that, "[o]nce the Company completes the Assessment and files the [2022 10-K], the Company will promptly complete and file the [1Q23 10-Q] as soon as practicable."

114.    The statements referenced in ¶ 113 were materially false and/or misleading statements and/or failed to disclose that: (i) Arrow was at an increased risk of being delisted from the NASDAQ; (ii) Arrow downplayed the true scope and severity of its defective disclosure

controls and procedures and internal controls over financial reporting, as well as the risks inherent in those defective controls; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

115.    On May 15, 2023, during pre-market hours, Arrow filed a current report on Form 8-K with the SEC (the "May 2023 8-K"), signed by Defendant Ivanov in his capacity as CFO, disclosing receipt of a second notice of non-compliance with the NASDAQ's periodic filing requirements as a result of its inability to timely file the 1Q23 10-Q:

> As previously disclosed in the Current Report on Form 8-K filed April 5, 2023 (the "April Form 8-K"), by the Company, the Company received a notice from the Listing Qualifications Department of The NASDAQ Stock Market LLC ("Nasdaq") that the Company is noncompliant with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) (the "Rule") as a result of its failure to file its [2022 10-K] with the [SEC] by the required due date (the "April Nasdaq Notice").
>
> On May 12, 2023, the Company received an additional notice from Nasdaq that the Company remains noncompliant with the Rule as a result of its failure to file its [1Q23 10-Q] with the SEC by the required due date (the "May Nasdaq Notice" and, together with the April Nasdaq Notice, the "Nasdaq Notices"). As disclosed by the Company on its [Late 1Q23 10-Q Notice], filed with the SEC on May 11, 2023, the Company was unable to timely file the [1Q23 10-Q] without unreasonable effort or expense.
>
> * * *
>
> As previously disclosed in the April Form 8-K, the Company is required to submit a plan, within 60 calendar days of receiving the April Nasdaq Notice, or by June 2, 2023, which outlines the steps the Company expects to take to become compliant with the Rule. If Nasdaq accepts the Company's plan, Nasdaq may grant an exception of up to 180 calendar days from the due date of the 2022 Form 10-K, as extended by Rule 12b-25, or by September 27, 2023, to regain compliance. However, there can be no assurance that Nasdaq will accept the Company's plan to regain compliance or that the Company will be able to regain compliance within any extension period granted by Nasdaq. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel. The Company currently expects to file one plan to address the Nasdaq Notices.

The Nasdaq Notices have no immediate effect on the listing or trading of the Company's shares of common stock, though Nasdaq will continue to broadcast an indicator over its market data dissemination network noting the Company's noncompliance. If the Company remains noncompliant with the Rule at the end of the 180-day extension period, the Company's shares of common stock will be subject to delisting from Nasdaq.

116.    The May 2023 8-K also revealed that Defendant "Murphy, the President and [CEO] and a member of the Board of Directors of Arrow . . . terminated his [own] employment as President and CEO and as a director of the Company and from all other positions he holds with the Company and its affiliates, effective May 12, 2023."  The timing of the second notice of non-compliance with the NASDAQ's periodic filing requirements and Murphy's self-termination left no doubt that Murphy's departure was a direct result of the core banking system disaster which led to defective disclosure controls and procedures and internal controls over financial reporting.  As a result of these deficiencies, the Company was unable to file its 2022 10-K and 1Q23 10-Q reports.

117.    On this news, Arrow's stock price fell $1.74 per share over two days, or 8.9%, to close at $17.85 per share on May 16, 2023.

118.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

119.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Arrow securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

120.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Arrow securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Arrow or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

122.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

123.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arrow;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Arrow securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

125.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Arrow securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Arrow securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

126.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

36

127.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

128.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

129.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

130.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Arrow securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Arrow securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

131.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Arrow securities.  Such reports, filings, press releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Arrow's defective disclosure controls and procedures and internal controls over financial reporting.

132.    By virtue of their positions at Arrow, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

133.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As officers and/or directors of Arrow, the Individual Defendants had knowledge of the details of Arrow's internal affairs.

134.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Arrow. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Arrow's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Arrow securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Arrow's defective disclosure controls and procedures and internal controls over financial reporting which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Arrow securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

135. During the Class Period, Arrow securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Arrow securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Arrow securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Arrow securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

136.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

137.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and/or misleading statements regarding Arrow's defective disclosure controls and procedures and internal controls over financial reporting to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

138.    Plaintiffs repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139.    During the Class Period, the Individual Defendants participated in the operation and management of Arrow, and conducted and participated, directly and indirectly, in the conduct of Arrow's business affairs.  Because of their senior positions, they knew the adverse non-public information about Arrow's defective disclosure controls and procedures and internal controls over financial reporting.

140.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Arrow's results of operations, and to correct promptly any public statements issued by Arrow which had become materially false or misleading.

141.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Arrow disseminated in the marketplace during the Class Period concerning Arrow's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Arrow to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Arrow within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Arrow securities.

142.    Each of the Individual Defendants, therefore, acted as a controlling person of Arrow.  By reason of their senior management positions and/or being directors of Arrow, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Arrow to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Arrow and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

143.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arrow.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demands a trial by jury.

Dated:  December 5, 2023                                 Respectfully submitted,

                                                                          POMERANTZ LLP

                                                                          */s/ Brenda Szydlo*
                                                                          Jeremy A. Lieberman
                                                                          Brenda Szydlo (admitted *pro hac vice*)
                                                                          Dean P. Ferrogari (admitted pro hac vice)
                                                                          600 Third Avenue, 20th Floor
                                                                          New York, New York 10016
                                                                          Telephone: (212) 661-1100
                                                                          Facsimile: (917) 463-1044
                                                                          jalieberman@pomlaw.com
                                                                          bszydlo@pomlaw.com
                                                                          dferrogari@pomlaw.com

                                                                          *Attorneys for Plaintiffs and the Proposed Class*

DocuSign Envelope ID: 2CB1D394-6116-4A0A-87E2-E564A6DC9812

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, <u>Jeffrey S. Gohn</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Arrow Financial Corporation ("Arrow" or the "Company") and authorize the filing of the Amended Complaint.

3.      I did not purchase or acquire Arrow securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Arrow securities during the relevant period described in the Amended Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate representative party in this action.

5.      The attached sheet lists all of my transactions in Arrow securities during the relevant period as discussed in the Amended Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Amended Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed   12/1/2023
          _____
                **(Date)**

**DocuSigned by:**

_____
                **(Signature)**
4F49717413D0427...

          _Jeffrey S. Gohn_
     **(Type or Print Name)**

2

**Arrow Financial Corporation (AROW)**                                    **Jeffrey S. Gohn**

### List of Purchases and Sales

| Account | Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Account 1 | Purchase | 3/15/2023 | 327 | $26.7500 |
| Account 2 | Purchase | 3/15/2023 | 1,881 | $26.7404 |