**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT C. ASHE and JEFFREY S. GOHN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ARROW FINANCIAL CORPORATION, THOMAS J. MURPHY, PENKO K. IVANOV, and EDWARD J. CAMPANELLA, <br><br> Defendants. | Civil Action No. 1:23-cv-00764-AMN-DJS |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO DISMISS**

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 4

    A.    Parties ........................................................................................ 4

    B.    Arrow's Core Conversion ........................................................ 4

    C.    Arrow's Additional Disclosures Concerning the Conversion ................. 5

    D.    This Action. ............................................................................... 8

ARGUMENT ......................................................................................................... 8

    I.    THE AC FAILS ADEQUATELY TO PLEAD SCIENTER. ............................ 10

    A.    The AC Alleges No Motive to Defraud. ................................. 11

    B.    The AC Does Not Allege Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness. ............................... 12

        1.    The AC's Confidential-Witness Allegations Fail to Plead Any Defendant's Knowledge. ........................................ 12

        2.    Messrs. Murphy's and Campanella's Resignations Are Not Indicative of Scienter. .......................................... 16

        3.    The More Compelling Inference Is that Arrow Kept Markets Apprised in Real Time of What Its Executives Had Learned. ........................................................... 17

    II.    THE AC FAILS TO PLEAD A MISLEADING STATEMENT. ..................... 17

    A.    The AC Pleads No Affirmatively Misleading Statement. ................. 18

        1.    The Sarbanes-Oxley Certifications ............................. 18

        2.    The March 16, 2023 Form 12b-25 ............................. 20

    B.    The AC Fails to Plead an Actionable Omission. ...................... 22

        1.    The June 30, 2022 and September 30, 2022 Form 10-Qs ........... 23

        2.    The March 16, 2023 Form 12b-25 and March 31, 2023 Form 12b-25/A ...................................................... 25

        3.    The April 5, 2023 Form 8-K ...................................... 27

        4.    The May 11, 2023 Form 12b-25 ............................... 28

    C.    Messrs. Campanella and Ivanov Cannot Be Liable for Statements Made When They Did Not Work for Arrow. ............................. 28

    III.    ABSENT A PRIMARY VIOLATION, THERE CAN BE NO CONTROL PERSON LIABILITY. ................................................................. 29

CONCLUSION ..................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Group Inc.*,
  47 F.3d 47 (2d Cir. 1995) .................................................................................9

*Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*,
  2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ........................................................28

*ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................9, 10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................22

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................29

*In re Carter-Wallace, Inc., Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000) ..............................................................................12

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013) ...........................................................25, 26

*Denny v. Barber*,
  576 F.2d 465 (2d Cir. 1978) ..........................................................................3, 21

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .....................................................................9, 10, 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) .................................................................23

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................12, 22

*Francisco v. Abengoa, S.A.*,
  559 F. Supp. 3d 286 (S.D.N.Y. 2021) .................................................................16

*Gillis v. QRX Pharma Ltd.*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016) .................................................................11

*Glaser v. The9, Ltd.*,
  772 F.Supp.2d 573 (S.D.N.Y. 2011) ..........................................................12, 14, 16

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
  2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022) .................................................17, 19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re J.P. Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................................23

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .....................................................................10, 12

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991) ...........................................................................4

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) ............................................. *passim*

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010) .........................................................9, 16

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) .................................................................17

*In re Lululemon Sec. Litig.*,
  604 F. App'x 62 (2d Cir. 2015) ....................................................................23

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ..........................................................15, 17

*Medina v. Tremor Video, Inc.*,
  2015 WL 3540809 (S.D.N.Y. June 5, 2015) ...................................................20

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ...........................................17

*New England Carpenters' Guaranteed Annuity and Pension Funds v. DeCarlo*,
  80 F.4th 158 (2d Cir. 2023) .........................................................................19

*ODS Cap. LLC v. JA Solar Holdings Co.*,
  2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) ............................................16

*Oklahoma Firefighters Pension and Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018) ..........................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................19, 20, 21

*In re PetroChina Co. Ltd. Sec. Litig.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015) ..........................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Philip Morris Int'l Sec. Litig.*,
  89 F.4th 408 (2d Cir. 2023) ....................................................................................21

*Pirnik v. Fiat-Chrysler Automobiles, N.V.*,
  2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017)..................................................12, 14

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. July 21, 2020)...........................................................11

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
  *Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................12

*In re Progress Energy, Inc.*,
  371 F. Supp. 2d 548 (S.D.N.Y. 2005).......................................................................28

*Ramirez v. Exxon Mobil Corp.*,
  334 F. Supp. 3d 832 (S.D. Tex. 2018) .....................................................................11

*In re Renewable Energy Grp. Sec. Litig.*,
  2022 WL 14206678 (2d Cir. Oct. 25, 2022)............................................................22

*In re Rigel Pharms. Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ....................................................................................11

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996).....................................................................................29

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
  *Inc.*,
  75 F.3d 801 (2d Cir. 1996).........................................................................................17

*Scibelli v. Roth*,
  2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) .............................................................23

*Sfiraiala v. Deutsche Bank AG*,
  729 F. App'x 55 (2d Cir. 2018) .................................................................................11

*Shemian v. Rsch. In Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ....................................................21, 24

*Shreiber v. Synacor Inc.*,
  832 Fed. App'x. 54 (2d Cir. 2020).............................................................................20

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Sierra Wireless, Inc. Sec. Litig.*,
   482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................29

*Silsby v. Icahn*,
   17 F. Supp. 3d 348 (S.D.N.Y. 2014) ......................................................................4

*Steinberg v. Ericsson LM Tel. Co.*,
   2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ......................................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) .................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................................................1, 10

*Thesling v. Bioenvision, Inc.*,
   374 F. App'x 141 (2d Cir. 2010) ..........................................................................23

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .................................................................................19

*Town of Davie Police Officers Ret. Sys. v. City of North Miami Beach Police*
   *Officers' and Firefighters Ret. Plan*,
   2021 WL 5142702 (2d Cir. Nov. 5, 2021) ......................................................11, 12

*In re Ultimate Corp. Sec. Litig.*,
   1989 WL 79372 (S.D.N.Y. July 11, 1989) ...........................................................23

**Statutes**

15 U.S.C. § 78u-4 .........................................................................................................1, 10

15 U.S.C. § 78u-5(c)(1)(A) ..............................................................................................21

15 U.S.C. § 78u-5(c)(1)(B) ..............................................................................................21

**Other Authorities**

E. Flores and S. Starykh, *Recent Trends in Securities Class Action Litigation:*
*2023 Full-Year Review* (Jan. 23, 2024) .............................................................................9

H.R. Rep. No. 104-369 (1995) ............................................................................................9

SEC Division of Corporation Finance, Finance Reporting Manual § 1330.1 (2020) .....................5

## PRELIMINARY STATEMENT

The essence of a securities fraud claim is a materially false statement made with scienter, i.e., fraudulent intent.  Nearly three decades ago, in enacting the Private Securities Litigation Reform Act of 1995, or PSLRA, Congress adopted stringent pleading requirements, mandating that securities fraud complaints must plead particularized facts (i) "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (ii) giving rise to a "strong inference" that the defendants intended to defraud investors.  15 U.S.C. § 78u-4.  Since 1995, federal courts (including the Supreme Court) have only fortified those pleading requirements, requiring that the scienter inference be "cogent and compelling."[1]  Speculative, conclusory, or hearsay allegations do not suffice.  The AC[2] fails to meet these fundamental pleading requirements and therefore must be dismissed.

This case stems from a systems conversion at Arrow Financial, a community bank headquartered in Glens Falls, New York.  Beginning in late 2021, Arrow began work to upgrade its "core banking system" responsible for processing transactions.  During the core conversion process and thereafter, Arrow repeatedly warned investors of the risks the core conversion posed, frankly disclosed internal control issues arising from the core conversion as they were identified, and explained the potential consequences of those internal control deficiencies,

---

[1] *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007).

[2] This brief refers to the terms Arrow Financial Corporation as "Arrow" or the "Company"; plaintiffs Arthur C. Ashe and Jeffrey S. Gohn as "Plaintiffs"; defendants Thomas J. Murphy, Penko K. Ivanov, and Edward J. Campanella as the "Individual Defendants," and together with Arrow, the "Defendants"; Plaintiffs' amended complaint as the "AC" (cited as "AC ¶ __"); the Private Securities Litigation Reform Act, codified at 15 U.S.C. § 78u-4, as the "PSLRA"; confidential witnesses as "CWs"; and certifications pursuant to the Sarbanes-Oxley Act of 2002 as "SOX certifications" or "Sarbanes-Oxley certifications."  References to "Ex. __" refer to exhibits to the Declaration of William J. Sushon in Support of Defendants' Motion to Dismiss, filed contemporaneously herewith.  Unless otherwise specified, all quotations and citations are omitted and all emphasis is added.

including the delisting of Arrow stock from the NASDAQ.  While Arrow's 2022 Form 10-K and first quarter 2023 Form 10-Q filings were delayed due to the core conversion issues, *Arrow was never delisted from the NASDAQ and never had to restate its financial results*. Nevertheless, Plaintiffs sued Arrow and three of its officers, maintaining that they misled investors by "downplaying" Arrow's internal- and disclosure-control problems and the accompanying risk of NASDAQ delisting (that never materialized).

These claims fail for many reasons, the most fundamental of which is a failure to plead fraudulent intent.  The AC identifies no motive to commit fraud, such as insider-stock sales by the Individual Defendants or other concrete benefits they may have reaped as a result of their alleged fraudulent scheme.  In fact, it cannot:  Arrow repurchased millions of dollars' worth of its shares during the alleged Class Period, when those shares' prices were allegedly artificially inflated by the so-called fraud.  Instead, the AC relies on accounts from eight confidential witnesses, or CWs, to try to plead circumstantial evidence showing that the Defendants knew their statements were false.  But none of the CWs (i) reported to the Individual Defendants (or even one of the Individual Defendants' direct reports), (ii) asserts that the CW was in a meeting with any of the Individual Defendants where the Individual Defendants learned of facts contradicting their allegedly false statements, or (iii) identifies a specific report that the Individual Defendants received that was at odds with their public statements.  Instead, the CWs generally describe a host of problems they allege occurred during and after the core conversion, and then assert in conclusory fashion that unidentified members of "management" "could have," "would have," "should have," or "must have" known they were occurring, including problems that occurred when the Individual Defendant in question did not even work at Arrow.

Courts in the Second Circuit have uniformly rejected such conclusory assertions, and the AC must be dismissed in its entirety on this basis alone. *See* pp. 12–16, *infra*.

As if that were not enough, the AC also fails to plead the other most basic element of a securities fraud claim—a materially false and misleading statement:

- Many of the statements that the AC challenges are statements of opinion or belief, such as the Sarbanes-Oxley certifications in Arrow's periodic filings, which the Supreme Court has held can be misleading only if the opinion or belief is not sincerely held, or the speaker omitted facts about the basis for the opinion or belief that render the statement misleading. But because the AC fails to plead Defendants' knowledge of facts contradicting their opinions and makes no effort to suggest that there was any shortcoming in Defendants' investigation underlying those opinions, it fails to plead that these statements were false. *See* pp. 18–22, *infra*.

- Other statements that the AC challenges for omitting material facts (such as a risk of delisting by the NASDAQ) were not misleading because the allegedly omitted facts were disclosed. *See* pp. 22–28, *infra*.

- Yet other alleged omission claims fail because the AC fails to plead that the Defendants knew (and thus had a duty to disclose) the omitted facts. *See* pp. 22–26, *infra*.

- Other challenged statements—such as Arrow's expectation that it would not need to restate its financial results—were indisputably accurate and cannot supply the basis for a securities fraud claim. *See* pp. 27–28, *infra*.

Stripped of the inadequate CW allegations, the AC boils down to a claim that disclosures Arrow made in later reports should have been made earlier. This type of pleading has a name—"fraud by hindsight"—and the Second Circuit has long found it insufficient to state a securities fraud claim.[3] The AC should be dismissed with prejudice.

---

[3] *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("In sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.")

## FACTUAL BACKGROUND[4]

### A.    Parties

*Defendants*:  Arrow is a bank holding company headquartered in Glens Falls, New York

that provides banking services and financial products.  (AC ¶ 29.)  Arrow's common stock

trades on the NASDAQ (*Id.* ¶ 31), making it subject to NASDAQ's publicly available listing

requirements.  (*See* Ex. A.)  Mr. Murphy was Arrow's President and CEO during the Class

Period, and also served as the Company's interim CFO from September 30, 2022 through

February 21, 2023.  (AC ¶ 24.)  Mr. Campanella was Arrow's CFO until September 30, 2022.

(*Id.* ¶ 23.)  Mr. Ivanov joined Arrow as its CFO on February 21, 2023.  (*Id.* ¶ 25.)

*Plaintiffs*:  Messrs. Ashe and Gohn allege they purchased Arrow stock and suffered

damages as a result.  (*Id.* ¶¶ 20–21.)  They seek to represent a putative class of investors who

purchased Arrow securities between August 6, 2022, and May 12, 2023.  (*Id.* ¶ 1.)

### B.    Arrow's Core Conversion

Like other banks, Arrow uses a "core banking system" that interfaces with numerous

systems to process transactions and support the bank's internal controls, including controls over

financial reporting.  (*Id.* ¶ 32.)  Through mid-September 2022, Arrow used a legacy core

banking system called FIS Bankway.  (*Id*. ¶ 3.)  On January 27, 2022, Arrow announced that it

had begun work in late 2021 on a planned core system upgrade to a new, more sophisticated

banking system called FIS Horizon.  (*See* Ex. B at 1; AC ¶ 3.)  On July 27, 2022, Arrow

disclosed that the upgrade was scheduled to occur in the third quarter of 2022.  (Ex. C at 2.)

---

[4] This factual background is drawn from the AC (the well-pleaded allegations of which must be
accepted as true for purposes of this motion), Arrow's SEC filings, and documents integral to
the AC, all of which the Court may consider on this motion.  *See, e.g.*, *Kramer v. Time Warner
Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of SEC filings); *Silsby v. Icahn*, 17
F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (same).

A few days later, on August 5, 2022, Arrow filed its Form 10-Q for the quarter ended

June 30, 2022.  (Ex. D.)  Arrow warned of "[p]otential [c]omplications with the implementation

of [its] new core banking system [that] could adversely impact [its] business and operations."

(AC ¶ 98 (quoting Ex. D at 72).)  Arrow further cautioned that it "may not be able to

successfully implement the new core system without experiencing delays, increased costs, and

other operational difficulties," including risks with its internal controls:  "the effectiveness of

our internal control over financial reporting could be adversely affected or our ability to assess

those controls adequately could be delayed or diminished."  (*Id*.)  Arrow concluded that "[i]f we

are unable to successfully implement the new core system as planned, our operations, financial

positions, results of operations and cash flows could be negatively impacted."  (*Id*.)

Arrow began using the FIS Horizon system in mid-September 2022.  (*See id.* ¶ 34.)  On

November 7, 2022, in its Form 10-Q for the quarter ended September 30, 2022, Arrow

disclosed the mid-September core conversion and cautioned that it had "encountered" some

"issues" following the conversion that would require a continued "investment of significant

personnel and financial resources."  (*Id*. ¶ 101 (quoting Ex. E at 73).)  Arrow also warned that

"there [could] be no assurance that" similar "issues will not arise in the future."  (*Id*.)

### C.    Arrow's Additional Disclosures Concerning the Conversion

Arrow's next periodic public filing, its 2022 Form 10-K, was due on March 16, 2023.[5]

But during the year-end closing process, Arrow had identified concerns involving its internal

controls, and so on March 16, 2023, the Company filed with the SEC a Form 12b-25 disclosing

that, as Arrow had previously warned could happen, Arrow required "additional time to

---

[5] *See* SEC Division of Corporation Finance, Finance Reporting Manual § 1330.1 (2020)
(instructing that "accelerated filers" like Arrow file Form 10-K 75 days after fiscal year end).

complete the assessment of internal controls over financial reporting as December 31, 2022."

(*Id.* ¶ 104 (quoting Ex. F, Part III).)  Arrow warned that, while it believed it could file the 2022

Form 10-K during the two-week extension period permitted by Rule 12b-25, it could "provide

no assurance that it will be able to file by [that] time."  (*Id.* ¶ 106 (quoting Ex. F, Part III).)

Arrow also cautioned that this assessment could adversely affect "the Company's ability to file

its Form 10-K and future SEC reports on a timely basis," and identified as among the factors

that could affect this timing:

> (i) the timing and results of the completion of the required procedures and documentation related to internal controls and the completion of audit procedures by our independent registered public accounting firm; (ii) the possibility that the Company and the Company's independent registered public accounting firm may identify errors or control deficiencies with respect to the Company's internal controls over financial reporting; (iii) the Company's ability to remediate any material weakness that may be identified."

(Ex. F, Part III.)

After two weeks' investigation, Arrow was still unable to file its 2022 Form 10-K.

Thus, on March 31, 2023, Arrow updated investors that Arrow was continuing to assess its

internal controls and expected to disclose certain deficiencies, including issues concerning:

> the design and execution of controls with respect to the Company's core system including post-migration from its legacy core system Bankway to its new operating system FIS Horizon in September 2022, such as with respect to the general ledger account reconciliation process.

(AC ¶ 107 (quoting Ex. G, Part III).)  Arrow reiterated that this assessment could adversely

affect its "ability to file its Form 10-K and future SEC reports on a timely basis" for the same

reasons it had previously disclosed.  (Ex. G, Part III.)

On April 5, 2023, Arrow timely disclosed on a Form 8-K filed with the SEC that on

April 3, 2023, it had received a notice of noncompliance with NASDAQ Listing Rule

5250(c)(1), which requires NASDAQ-listed companies to "timely file all required periodic

6

financial reports with the [SEC]."  (AC ¶ 109 (quoting Ex. H, Item 3.01).)  Arrow explained that

the notice "ha[d] no immediate effect on the listing or trading of the Company's shares of

common stock," but warned that Arrow's stock could be delisted if it failed to (i) submit to

NASDAQ an acceptable plan to regain compliance or (ii) regain compliance under a NASDAQ-

approved plan.  (*Id*.)  Arrow again cautioned that its "ability to file its Form 10-K and future

SEC reports on a timely basis" could change in the future.  (Ex. H, Item 3.01.)

On May 11, 2023, as Arrow's investigation continued, it disclosed that it would be

unable timely to file its 10-Q for the quarter ended March 31, 2023.  (AC ¶ 111 (quoting Ex. I,

Part III).)  On May 15, 2023, Arrow disclosed that on May 12, 2023, it had received a notice of

noncompliance from NASDAQ due to the Company's failure timely to file its Form 10-Q for

the first quarter of 2023.  (*Id.* ¶ 115 (quoting Ex. J, Item 3.01).)  Like the earlier notice for the

2022 Form 10-K, the May 15, 2023 notice warned that Arrow faced the risk of delisting if it did

not regain compliance under a NASDAQ-approved plan.  (*Id.*)  Arrow also stated that "[u]pon

the submission of the 2022 Form 10-K, the Company intends to promptly prepare and file the

First Quarter Form 10-Q as soon as practicable."  (*Id.*)  In the same disclosure, Arrow also

announced that Mr. Murphy had "terminated his employment as president and CEO and as a

director the Company . . . effective May 12, 2023."  (*Id.* ¶ 116 (quoting Ex. J, Item 5.02).)

On July 18, 2023, after it had fully investigated its internal control issues, Arrow filed its

2022 Form 10-K.  (*Id*. ¶ 93; Ex. K)[6]  Shortly thereafter, on July 27, 2023, Arrow filed its Form

10-Q for the first quarter ended March 31, 2023.  (Ex. L.)  In its 10-K, Arrow confirmed it had

identified material weaknesses in internal controls, specifically a failure to "effectively perform

---

[6] In paragraph 106, the AC alleges "[t]he Company did not file its 2022 Form 10-K until . . . November 18, 2023."  That is incorrect; the 2022 Form 10-K was filed four months earlier, on July 18, 2023.  *See* AC ¶ 93; Ex. K.

risk assessment procedures to identify the impact of the [core banking] conversion on our internal control over financial reporting."  (AC ¶ 94 (quoting Ex. K at 17).)  Arrow noted that those weaknesses "did not result in a material misstatement of our annual or interim financial statements."  (Ex. K at 17, 112.)  In fact, Arrow never restated its financial results and was never delisted from NASDAQ.

### D.     This Action

On June 23, 2023, Ashe filed the original complaint in this action, alleging that Defendants made various materially misleading statements between March 12, 2022, and May 12, 2023, concerning Arrow's internal controls, core conversion, and listing status with NASDAQ.  (Dkt. No. 1.)  After the Court appointed Ashe lead plaintiff on September 28, 2023, Plaintiffs filed the AC on December 6, 2023.  (Dkt. No. 26.)

Plaintiffs attempt to bolster the original complaint's allegations with alleged statements from eight CWs who allegedly worked at Arrow during or after the core conversion process.  (*Id.*)  While these CWs allege there were various problems with Arrow's core conversion, the AC fails to allege that any CW had any direct contact with the Individual Defendants, and aside from speculation that various unidentified members of "management" "must have known" about these alleged issues at unspecified times, the AC makes no effort to tie these alleged issues to the Individual Defendants.  (*See infra* pp. 12–16.)

Based on these allegations, the AC asserts claims under Exchange Act (i) Section 10(b) and Rule 10b-5 for allegedly materially misleading statements against all Defendants and (ii) Section 20 for control person liability against the Individual Defendants.

### ARGUMENT

To state a securities fraud claim, Plaintiffs must plead that Defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the

purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[7]  The allegations must do more than simply satisfy Rule 8's minimal plausibility requirement.[8]  Instead, for nearly three decades, Rule 9(b) and the PSLRA have required Plaintiffs to plead particularized facts supporting their claims.[9]

In passing the PSLRA, Congress recognized that "[u]nwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress."[10] Congress therefore sought to "curtail the filing of meritless lawsuits" by securities plaintiffs looking to extract a settlement "whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer."[11]  Thus, under the PSLRA's stringent pleading requirements, a securities fraud complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.[12]

---

[7] *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 105 (2d Cir. 2007); *see Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co*., 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010).

[8] *See ATSI Comm'ns, Inc*., 493 F.3d at 99.

[9] *See Acito v. IMCERA Group Inc.*, 47 F.3d 47, 51–52 (2d Cir. 1995).

[10] H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.).

[11] *Id.* at 31, 41.

[12] *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  These stringent pleading requirements result in frequent dismissal of securities class actions.  According to a recent report from the economic consulting firm National Economic Research Associates analyzing cases filed and resolved between January 2014 and December 2023, motions to dismiss are filed in 96% of securities class actions.  In cases where motions to dismiss are filed, 17% are voluntarily dismissed before a decision on the motion, and of those motions that go to decision, 60% are granted in their entirety and 80% are granted at least in part.  *See* E. Flores and S. Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* at 15–16 (Jan. 23, 2024), https://www.nera.com/content/dam/nera/publications/2024/PUB_2023_Full-Year_Sec_Trends_0123.pdf.

The PSLRA's strict pleading requirements undergird those of Rule 9(b), which likewise requires that the circumstances of fraud be pleaded with particularity. Like the PSLRA, Rule 9(b)'s "pleading constraint serves to . . . safeguard [a defendant's] reputation from improvident charges of wrongdoing and protect him against strike suits."[13] This case presents a textbook example for why these strict pleading requirements are necessary.

## I. THE AC FAILS ADEQUATELY TO PLEAD SCIENTER.

Scienter puts the "fraud" in securities fraud; it is an intent "to deceive, manipulate, or defraud."[14] Given Congress's recognition of the serious harm that can arise from baseless fraud allegations, the PSLRA adopted stringent standards for pleading scienter, requiring plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with" fraudulent intent.[15] This requires scienter allegations that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[16] For this reason, the Supreme Court has instructed that in assessing whether a complaint pleads scienter, courts must *not* draw inferences in plaintiffs' favor.[17] Plaintiffs can plead scienter in two ways, by pleading particularized facts that would establish either (1) that Defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.[18] The AC does neither.

---

[13] *ATSI Comm'ns, Inc.*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[14] *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198.

[15] 15 U.S.C. § 78u-4; *see ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 196.

[16] *Tellabs, Inc.*, 551 U.S. 308, 324 (2007); *see also ATSI Comm'ns. Inc.*, 493 F.3d at 99.

[17] *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (dismissing complaint that failed to raise scienter inference "at least as compelling as competing one).

[18] *See Kalnit v. Eichler*, 264 F.3d 131, 138–39 (2d Cir. 2001) (complaint must allege particularized facts that either (1) demonstrate "defendants had both motive and opportunity to

A.      The AC Alleges No Motive to Defraud.

"[T]o raise a strong inference of scienter through motive and opportunity to defraud, Plaintiffs must allege that [the defendant company] or its officers benefitted in some concrete and personal way from the purported fraud."[19]  This is typically accomplished through allegations of suspiciously timed or sized trades in the defendant company's securities or other particularized concrete, personal benefits to defendants from inflating the defendant company's stock price.[20]  The AC here is utterly devoid of such allegations.  And little wonder—during the alleged class period, when Arrow's share price was allegedly inflated, the Company was engaged in a program under which it repurchased more than $2 million worth of its stock in 2022 and authorized the repurchase of up to $5 million more in 2023.  (*See* Exs. M, N.)  Such repurchases are inconsistent with an intent to defraud and, if anything, support a more "cogent and compelling" inference that the Defendants *lacked* scienter.[21]

---

commit fraud," or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness").

[19] *ECA & Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198; *Town of Davie Police Officers Ret. Sys. v. City of North Miami Beach Police Officers' and Firefighters Ret. Plan*, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021) (same).

[20] *See Sfiraiala v. Deutsche Bank AG*, 729 F. App'x 55, 57–58 (2d Cir. 2018) (allegations of "culture of greed and corruption" insufficient to plead concrete personal benefit); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600–01 (S.D.N.Y. 2016) ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit.").

[21] *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 854 (S.D. Tex. 2018) (defendant company's "purchase of billions of dollars' worth of its own stock during the Class Period" coupled with lack of insider sales "does weigh against a finding of scienter"); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *18 (N.D. Cal. July 21, 2020) ("lack of stock sales" "undermined" scienter inference such that it was not "cogent or compelling"); *In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012) (lack of stock sales by defendants "during the period between the allegedly fraudulent statements and the subsequent public disclosure of the detailed data, which is the period during which they would have benefitted from any allegedly fraudulent statements" supported an inference of no scienter).

**B.      The AC Does Not Allege Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness.**

Because the AC identifies no motive, Plaintiffs must rely on circumstantial evidence of actual knowledge, which imposes a "correspondingly greater" burden.[22]  This requires Plaintiffs to plead conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care"[23] and a state of mind "approximating actual intent and not merely a heightened form of negligence."[24]  Plaintiffs' efforts fall flat.

1.      *The AC's Confidential-Witness Allegations Fail to Plead Any Defendant's Knowledge.*

The AC's efforts to plead scienter rest almost exclusively on a grab-bag of alleged remarks from alleged CWs.  Courts will not credit such confidential sources unless they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[25]  Further, CW allegations must plead particularized facts showing "that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements."[26]  Thus, "conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."[27]

---

[22] *Town of Davie Police Officers Ret. Sys.*, 2021 WL 5142702, at *2 ("[W]here the plaintiffs do not allege facts supporting a motive, their circumstantial evidence of actual knowledge must be correspondingly greater."); *Kalnit*, 264 F.3d at 142.

[23] *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).

[24] *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010) (emphasis in original).

[25] *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) ("*Francisco I*").

[26] *Pirnik v. Fiat-Chrysler Automobiles, N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (same) (quoting *Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 217 (2d Cir. 2010)).

[27] *Pirnik*, 2017 WL 3278928, at *3.

The AC's CW allegations are utterly conclusory.  The vast bulk of them fail to allege that *any* of the Defendants were made aware of *any* facts, instead relying on generic allegations that "everybody" or anonymous members of "management" "would have," "could have," or "should have" known the alleged facts:

- "Arrow's *top leadership* knew the issue but didn't change direction.  They didn't change their plan—there was no plan."  (AC ¶ 48.)

- "[E]*veryone* at Arrow was '*well aware*' of the challenges the core conversion posed." (*Id.* ¶ 53.)[28]

- "[T]here was no way *the executives* weren't soon aware that the bank's financial reporting was in shambles."  (*Id.* ¶ 57.)[29]

- "[T]his was something I had told *management* about the entire time since the core conversion."  (*Id.* ¶ 75.)[30]

Even where the CW allegations identify the Individual Defendants by name, the allegations still are conclusory and speculative, asserting that the Defendants "must" or "should" have known the adverse facts:

- "CW-2 *believes* that Defendants Campanella and Murphy *would have* received reports about the problems IT faced."  (*Id.* ¶ 51.)

- "According to CW-3, CFO Campanella and CEO Thomas [Murphy] *had to understand* that bank employees were scrambling as the core conversion approached in September 2022."  (*Id.* ¶ 55.)

- "CW-3 stated that Murphy and the other leaders *had to know* that employees were leaving the bank in droves."  (*Id.* ¶ 60.)

- "As problems stemming from the core conversion spiraled in the fall of 2022, Murphy and Ivanov *had to be aware*."  (*Id.* ¶ 78.)  This allegation is particularly incredible,

---

[28] *See also* AC ¶ 55 ("*Everyone* at the bank was still struggling to feel comfortable with the new system as the core conversion approached.").

[29] *See also* AC ¶¶ 45 ("CW-2 was sure the *C-Suite executives* were aware."), 74 ("Asked whether the executives at the bank would have been aware of the problems . . . CW-5 stated, 'there's no way they didn't receive reports.'").

[30] *See also* AC ¶¶ 48 ("Arrow's *top leadership* knew the issue but didn't change direction."), 77 ("I was bringing it to *management's* attention, and they didn't want to do anything about it.").

because as the AC itself acknowledges, Mr. Ivanov did not even join Arrow until *February 2023*.  (*See id*. ¶ 25.)

Speculative assertions such as these are simply insufficient under Rule 9(b) and the PSLRA because they do not supply particularized *facts* necessary to plead scienter.[31]

Other statements involving the Individual Defendants by name do not allege they were apprised of anything,[32] or else state in generic terms that the Defendants were "well-informed" without specifying the facts they learned, when they learned them, or how those unspecified facts contradicted the defendants' statements.[33]  Numerous courts in this Circuit have rejected such allegations as insufficiently particularized.[34]  Yet other statements allege only that Defendants learned details of issues at some point *post-conversion*—when the company indisputably disclosed to investors that the conversion had resulted in some "issues" that required the Company to follow up and warned that its periodic filings may be untimely—and

---

[31] *See Pirnik*, 2017 WL 3278928, at *3 ("[M]ere allegations that defendants 'would have' or 'should have' had . . . knowledge [are] insufficient."); *Glaser*, 772 F. Supp. 2d at 591 (CW statements that defendants "were aware" and allegations that defendants "would have" or "should have" had such knowledge insufficient to plead scienter).

[32] *See, e.g.*, AC ¶ 53 ("Murphy was 'making necessary decisions' and served as the ultimate decision-maker.")

[33] *See* AC ¶¶ 36 ("According to CW-1, Defendants Murphy, Campanella, and Ivanov closely scrutinized progress of the core conversion."), 38 ("CW-8 stated that Murphy and Ivanov were well-informed throughout the conversion process."), 51 ("CW-2 *believes* that Defendants Campanella and Murphy *would have* received reports about the problems IT faced.").  Again, these conclusory allegations are particularly suspect because, for example, Mr. Ivanov did not even join Arrow until February 2023, *five months* after the core conversion concluded (and so he could not have been scrutinizing the core conversion's "progress" or been well-informed through the conversion process).  *See id*. ¶ 25; *see also id.* ¶ 70 (alleging Individual Defendant Murphy said "Oh, we were unable to get our reports ready on time," without specifying when the statement was allegedly made).

[34] *See, e.g.*, *Pirnik*, 2017 WL 3278928, at *3 ("conclusory" CW statements that "defendants 'were aware' of certain information" inadequate); *Glaser*, 722 F. Supp. 2d at 591 (rejecting conclusory CW allegations that defendants "were aware" of contradictory information).

so do not contradict the Company's challenged statements.[35]  In sum, while the CWs "muster a litany of criticisms" regarding the core conversion, none supports an inference "that [D]efendants' statements or omissions regarding their controls were known to be false" when made.[36]

Given this, it should come as no surprise that the CWs were all low- to mid-level employees several rungs down the corporate ladder from the Defendants.  CW-1 for example, who insists that "management was well aware" of the post-conversion complications, was a "fraud specialist" who reported to an Assistant Vice President, who reported to a Director.  (AC ¶¶ 35, 53.)  CW-3, who "can't imagine [Arrow executives] weren't aware" of post-conversion issues, was a "loan services manager," and the AC does not even bother to specify to whom he or she reported.  (*Id.* ¶¶ 54, 57.)  The alleged titles and responsibilities for the remaining CWs are no more compelling because none was within two levels of reporting to the Individual Defendants:

- CW-2 was a "former employee who worked in Systems," who reported to an SVP, who reported to Arrow's CIO (*id.* ¶ 40);

- CW-4 was an "internal auditor" who reported to an SVP (*id.* ¶ 61);

- CW-5 was a "quality assurance, training and operations team lead" who reported to an AVP who reported to a VP (*id.* ¶ 64);

- CW-6 was a "public relations and communications manager" who reported to an SVP (*id.* ¶ 36 n.4);

- CW-7 is described only as a "VP Senior Administration Manager" (*id.* ¶ 36 n.5 ); and

---

[35] *See* AC ¶¶ 38 (noting that Messrs. Murphy and Ivanov "received" unspecified "daily reports *following* the conversion" and "held daily update calls *post-conversion*"), 50–51 (alleging that CW-2 "believe[d] that Defendants Campanella and Murphy would have received reports about the problems IT faced," particularly "issues with vendor integration after the core conversion").

[36] *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

•   CW-8 was an "associate" who reported to an AVP who reported to a VP (*id.* ¶ 37).

Such attenuated ties to upper management further undermine the CWs' speculative, conclusory

accounts.[37]

The AC fares no better with speculative allegations that the Individual Defendants

received unspecified reports concerning the core conversion.[38]  The AC does not plead with

particularity "what specific contradictory information the Individual Defendants received or

when they received it," rendering these allegations hopelessly conclusory.[39]

> 2.   *Messrs. Murphy's and Campanella's Resignations Are Not Indicative of Scienter.*

The AC also suggests that Mr. Campanella's and Mr. Murphy's resignations contribute

to a strong scienter inference.  (AC ¶¶ 80–81, 89.)  The short and complete answer is that these

allegations are irrelevant absent "independent facts indicat[ing] that the resignation was

somehow tied to the fraud alleged."[40]  No such facts are alleged here.

---

[37] *See Local No. 38*, 724 F. Supp. at 460 (disregarding allegations from "low-level employees" who had no contact with the defendants); *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (allegations from CWs who all "were mid-level managers . . . who claim no contacts or communications with Defendants" inadequate); *ODS Cap. LLC v. JA Solar Holdings Co.*, 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020) ("The CWs' employment descriptions in the amended complaint–financial analysts, sales manager, and sales staff–do not suggest that these CWs were in a position to" receive information from "corporate management.").

[38] *See* AC ¶¶ 38 (alleging that Murphy and Ivanov "received daily reports"), 51 (alleging defendants "would have received reports about the [core conversion] problems IT faced from CIO Jacobs," because "it was Jacobs' responsibility to 'relay stuff higher up the chain'").

[39] *Local No. 38*, 724 F. Supp. at 461; *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137–38 (E.D.N.Y. 2020) (allegations that individual defendant attended "weekly meetings" at which participants discussed software conversion problems insufficient absent further specification of reports or statements).

[40] *Glaser*, 772 F. Supp. 2d at 598; *see also Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 321 (S.D.N.Y. 2021) ("*Francisco II*").

3.    *The More Compelling Inference Is that Arrow Kept Markets Apprised in Real Time of What Its Executives Had Learned.*

The bottom line is that the AC's allegations support the far more compelling inference that Defendants timely "acknowledg[ed] the company's material weaknesses and disclos[ed] their continued efforts to resolve them, only to learn of yet more."[41]  Arrow's disclosures in the AC itself demonstrate as much:  (i) before the conversion, Arrow disclosed that the forthcoming upgrade carried risks, including a potential delay in its ability to assess its internal controls over financial reporting; and (ii) once the conversion was complete, Arrow made a series of "abundant disclosures regarding the disruptions that the transition had caused."[42]  (*See* pp. 4–8, *supra*.)  Indeed, Arrow's disclosures of ongoing "remedial efforts" only further "weakens rather than strengthens an inference of scienter."[43]  In short, this "steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors."[44]

## II.    THE AC FAILS TO PLEAD A MISLEADING STATEMENT.

To plead an actionable misleading statement, a plaintiff must allege particularized facts showing that the defendants (i) made a material misrepresentation that was false when made, or (ii) failed to disclose material information in dereliction of a legal duty.[45]  The AC does neither.

---

[41] *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d at 297.

[42] *Lachman*, 487 F. Supp. 3d at 138.

[43] *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *17 (S.D.N.Y. Sept. 30, 2016) (announcement of remedial steps to improve internal controls weakened inference of scienter); *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *23 (E.D.N.Y. Nov. 4, 2022) (same).

[44] *Lachman*, 487 F. Supp. 3d at 138; *see also In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d at 297–98.

[45] *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570–72 (S.D.N.Y. 2014).

A.      **The AC Pleads No Affirmatively Misleading Statement.**

1.      *The Sarbanes-Oxley Certifications*

The AC alleges that the Sarbanes-Oxley certifications and related disclosures in Arrow's

June 30, and September 30, 2022 Form 10-Qs were affirmatively misleading.  (*See* AC ¶¶ 96–

97, 99–100, 102.)  Those certifications stated that the signing officers (i) did not believe that the

Form 10-Qs contained any materially misleading statement[46] and (ii) had evaluated the

effectiveness of Arrow's internal controls over financial reporting and disclosed any material

changes in those controls.[47]  The Form 10-Qs, in turn, disclosed "based on" those evaluations

that "senior management, including the Chief Executive Officer and Chief Financial Officer,

concluded that disclosure controls and procedures were effective" and that "there were no other

changes in Arrow's internal control over financial reporting that occurred during the quarter. . . ,

that materially affected, or are reasonably likely to materially affect, Arrow's internal control

over financial reporting."  (Ex. D at 71; Ex. E at 72.)  The Second Circuit has held that

Sarbanes-Oxley officer certifications "signal that they are opinions by stating that they are

'based on [the] knowledge' of the officer" and "contain language that conveys management's

---

[46] *See* Ex. D, SOX Certifications of the Chief Executive Officer and Chief Financial Officer
("Based on my knowledge, this report does not contain any untrue statement of a material fact
or omit to state a material fact necessary to make the statements made, in light of the
circumstances under which such statements were made, not misleading with respect to the
period covered by this report."); Ex. E, SOX Certifications of the Chief Executive Officer and
Chief Financial Officer (same).

[47] *See* Ex. D, SOX Certifications of the Chief Executive Officer and Chief Financial Officer
("The registrant's other certifying officers and I . . . have . . . [d]isclosed in this report any
change in the registrant's internal control over financial reporting that occurred during the
registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an
annual report) that has materially affected, or is reasonably likely to materially affect, the
registrant's internal control over financial reporting."); Ex. E, SOX Certifications of the Chief
Executive Officer and Chief Financial Officer (same).

subjective judgments about the company's internal controls and thus constitute statements of opinion."[48]

Under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, opinion statements such as these are not actionable just because the speaker's opinion turned out to be wrong.[49]  Instead, opinion statements are actionable only where the complaint pleads (i) particularized facts that show that the belief was not honestly held, or (ii) "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[50]  As discussed above, the AC fails to plead facts showing that Messrs. Murphy and Campanella did not genuinely believe their statements concerning Arrow's controls were correct.  (*See* pp. 12–16, *supra*.)[51]  Nor does the AC plead that they did not actually undertake the evaluation the 10-Qs said they did.[52]

---

[48] *New England Carpenters' Guaranteed Annuity and Pension Funds v. DeCarlo*, 80 F.4th 158, 176 (2d Cir. 2023); *see also Lachman*, 487 F. Supp. 3d at 134 ("The SOX certifications that plaintiffs challenge all contained an important qualification that the certifying officer's statements are true 'based on his [or her] knowledge.'").

[49] 575 U.S. 175, 186 (2015) (holding that "sincere statement[s] of pure opinion" are not "untrue statement[s] of material fact, regardless whether an investor can ultimately prove the belief wrong"); *see also Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) ("[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect.").

[50] *Omnicare*, 575 U.S. at 194; *accord Tongue*, 816 F.3d at 214.

[51] *See Lachman*, 487 F. Supp. 3d at 135 (finding complaint failed to plead subjective disbelief based on alleged "issues" with systems implementation because "awareness of the underlying operational issues, even if established, would not imply their knowledge that those issues had caused a material weakness" in controls).

[52] *See New England Carpenters' Guaranteed Annuity and Pension Funds*, 80 F.4th at 176 (affirming dismissal of claim based on SOX certifications where "the Complaint fails to allege any facts that establish a lack of meaningful inquiry"); *see also In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *23 (E.D.N.Y. Nov. 4, 2022) (dismissing claims based on SOX certifications where complaint failed to "even discuss, let alone disprove, the assertions in the SOX Statements that management reviewed [defendant's] internal controls and concluded that the controls were effective"); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340,

While this alone warrants dismissal of the claims premised on the Sarbanes-Oxley certification statements, there is also the "statement's context," to consider, which takes "account of . . . any [] hedges, disclaimers, or qualifications" that accompany the challenged opinions.[53] Here, as the AC must acknowledge, the August 5, 2022 Sarbanes-Oxley statements came with warnings of "[c]omplications with the implementation of our new core banking system" that included "delays, increased costs, and other operational difficulties" that could adversely affect Arrow's financial results, undermine "the effectiveness of our internal control over financial reporting," and delay Arrow's "ability to assess" those controls (AC ¶ 98 (quoting Ex. D at 72).)  And the November 7, 2022 Form 10-Q further disclosed to investors that Arrow *had* "encountered some . . . issues" with the new core system that "could adversely impact our business and operations."  (Ex. E at 73 (quoted in AC ¶ 101).)  Cautionary statements such as these are inconsistent with an intent to mislead and put investors on notice that the Sarbanes-Oxley opinion statements were not iron-clad.  This fortifies the conclusion that claims regarding those statements should be dismissed.[54]

### 2.   *The March 16, 2023 Form 12b-25*

The AC also attacks as affirmatively misleading statements in Arrow's March 16, 2023 Form 12b-25 that "the Company *believe[d]*" it would file its 2022 Form 10-K "within the extension period provided under Rule 12b-25 of the [Exchange Act]."  (AC ¶ 106 (quoting Ex. F, Part III).)  Like the Sarbanes-Oxley statement, this statement is one expressly of opinion

---

359 (S.D.N.Y. 2015) (dismissing challenges to SOX certifications because plaintiffs failed to plead "that PetroChina failed to evaluate its internal controls").

[53] *Omnicare*, 575 U.S. at 196; *see also Medina v. Tremor Video, Inc.*, 2015 WL 3540809, at *2 (S.D.N.Y. June 5, 2015).

[54]*See Shreiber v. Synacor Inc.*, 832 Fed. App'x. 54, 57 n.1 (2d Cir. 2020) (dismissing claim based on opinion statements accompanied by "meaningful cautionary language specifically addressing the risks alleged to have materialized").

under *Omnicare*.[55]  The AC is devoid of any allegations that the Defendants did not in fact

believe that Arrow would be able to file within the deadline or that such a belief was

unreasonable, instead relying solely on the fact that Arrow ultimately proved unable to file

within the extension period.  (*See* AC ¶ 106 (alleging that extension period was only two weeks,

whereas the 2022 Form 10-K was filed months after the two-week extension period).)  This is

precisely the sort of hindsight allegation that the Second Circuit has condemned for nearly half

a century.[56]  And, of course, Plaintiffs ignore Arrow's warning that there could be "no

assurance" the 2022 Form 10-K could be filed within the extension period and delineating the

factors that could cause a delay.  (*Id.* (quoting Ex. F, Part III).)  As discussed above, such

cautionary language reinforces that Arrow's belief statement was inactionable.  *See* n. 54,

*supra*.

The challenged statement is also protected by the PSLRA's safe harbor for forward-

looking statements, which provides that a defendant "shall not be liable with respect to any

forward-looking statement" if (1) the forward-looking statement is "identified" as such and

"accompanied by meaningful cautionary statements," or (2) the plaintiff "fails to prove that the

forward-looking statement . . . if made by a natural person, was made with actual knowledge by

that person that the statement was false or misleading."[57]  If either of these tests is satisfied, the

---

[55] 575 U.S. at 183–85 (noting the phrase "I believe" is "opinion words").

[56] *See Denny*, 576 F.2d at 470 ("In sum, the complaint is an example of alleging fraud by hindsight. For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones."); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 429 (2d Cir. 2023) (noting that "fraud by hindsight approach" has been "firmly rejected").

[57] 15 U.S.C. § 78u-5(c)(1)(A)-(B); *see also Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *23 n.13 (S.D.N.Y. Mar. 29, 2013) ("The PSLRA's safe-harbor provision for forward-looking statements protects from liability 'statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or

statement at issue is inactionable.[58]  The challenged statement in the March 16, 2023 Form 12b-25 satisfies both.

- As to the first prong, the use of words such as "believe," "expect," or "will" are sufficient to indicate that a statement is forward-looking.[59]  Here, not only did the challenged statement use the words "believe" and "will," but it also appeared in a filing that specifically noted that it contained forward-looking statements protected by the PSLRA safe harbor.  (*See* Ex. F, Part III.)  And as discussed above, this statement was also accompanied by meaningful risk disclosures tailored to warn investors of the possibility that Arrow might not timely file its 2022 Form 10-K and the factors that could affect that timing. [60]  (*See id.*)

- As to the second prong, as discussed above, the AC fails to plead recklessness, much less that any defendant had *actual knowledge* that the statements were false when made.  *See* pp. 12–16, *supra*.  This independently anchors the statement within the safe harbor.[61]

For this reason, too, the AC fails to plead that the March 16, 2023 Form 12b-25 was materially false or misleading.

### B.    The AC Fails to Plead an Actionable Omission.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."[62]  A disclosure duty arises either (i) expressly under "an independent statute or regulation" or (ii) where disclosing the allegedly omitted information is necessary "to avoid rendering existing

---

services of the issuer' and 'statement[s] of future economic performance,' so long as a statement is (1) identified as forward-looking and accompanied by meaningful cautionary language, (2) immaterial, or (3) made without knowledge that the statement is false and misleading.") (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765–66 (2d Cir. 2010)).

[58] *See Oklahoma Firefighters Pension and Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 567 (S.D.N.Y. 2018) ("Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories.") (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).

[59] See *Francisco I*, 481 F. Supp. 3d at 211.

[60] *See Oklahoma Firefighters Pension and Ret. Sys.*, 300 F. Supp. 3d at 574–75 (finding safe harbor applied because "cautionary language was sufficient" to warn investors).

[61] *See In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *4 (2d Cir. Oct. 25, 2022) (finding PSLRA safe harbor applied where complaint alleged mere recklessness, which was "categorically insufficient" to plead forward-looking statement's falsity)

[62] *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

statements misleading."[63]  The AC identifies no statute or regulation requiring the disclosure of

any of the allegedly omitted information.  Thus, to plead an omission claim, the AC must

identify a statement that is rendered misleading by the alleged omission and plead with

particularity how the omission makes the statement misleading.[64]  Further, companies and their

officers are duty-bound to disclose only information they had at the time of the alleged

misleading statement.[65]  In other words, there is no duty to disclose what one does not know.

        *1.       The June 30, 2022 and September 30, 2022 Form 10-Qs*

The AC alleges that the June 30, 2022 and September 30, 2022 Form 10-Qs omitted that

Arrow allegedly maintained defective disclosure over internal controls, increasing the risk that

Arrow (i) may not timely file its periodic financial reports with the SEC; and (ii) could be

delisted.  (*See* AC ¶ 103.)

As for the June 30, 2022 Form 10-Q, that document made clear that its statements

concerning Arrow's internal controls were "as of June 30, 2022."  (Ex. D at 71.)  But the AC

alleges that the supposedly undisclosed internal and disclosure control issues arose as a result of

---

[63] *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010).

[64] *In re Lululemon Sec. Litig.*, 604 F. App'x 62, 63 (2d Cir. 2015) ("Insofar as the defendants are alleged to have omitted information" plaintiff "failed adequately to plead with particularity that these omissions rendered the defendants' statements 'inaccurate, incomplete, or misleading.'").

[65] *See Scibelli v. Roth*, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000) ("Since it cannot be reasonably inferred that the defendants had the allegedly omitted data at the time the prospectus was issued, it is not even necessary to determine whether the defendants were even required to disclose such information."); *see also In re J.P. Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (noting that omission claim requires allegations that "defendant possessed the omitted information" when allegedly false statement made); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 255 (S.D.N.Y. 2004) (holding that omission claim "must plead facts demonstrating the defendant possessed the omitted information"); *In re Ultimate Corp. Sec. Litig.*, 1989 WL 79372, at *3–4 (S.D.N.Y. July 11, 1989) (finding no duty to disclose executives' planned departure from defendant company because "defendants did not know that any departure was in the offing," so "there was nothing of substance to disclose").

the core conversion,[66] which did not occur until *mid-September 2022*, nearly three months after June 30, 2022, and more than a month after the June 30, 2022 Form 10-Q's filing.[67]  Failing to disclose events that had not yet occurred or risks that had not yet arisen cannot give rise to a federal securities claim.[68]  In any event, as discussed above, Arrow warned in the June 30, 2022 Form 10-Q of the potential for the very risk that plaintiffs allege Arrow omitted:  "the risk that the Company could not timely file one or more of its periodic financial reports with the SEC." (AC ¶ 103).

The AC fares no better challenging the September 30, 2022 Form 10-Q, which expressly stated that its disclosures concerning Arrow's internal and disclosure controls were "as of September 30, 2022" (Ex. E at 72.),  *i.e.*, approximately two weeks after the core conversion went live.  (AC ¶ 34.)  The September 30, 2022 Form 10-Q disclosed that the core conversion was complete, acknowledged that in the roughly two weeks the new system had been in operation, Arrow had "encountered some limited issues," and warned investors that there could be "no assurance that" Arrow would not encounter further issues in the future.  (*Id*. ¶ 101 (quoting Ex. E at 73).)  As discussed above, the AC improperly relies entirely on speculative, conclusory, hearsay CW allegations that the Defendants allegedly were then aware of any internal or disclosure control issues before they were disclosed.  (*See* pp. 12–16, *supra*.)  And

---

[66] *See* AC ¶ 5 (alleging that the core conversion "created material weaknesses" in Arrow's disclosure and internal controls).

[67] *See id.* ¶ 34 (alleging that in "mid-September 2022 . . . Arrow implemented a new core banking system and internal controls over financial reporting were revised in connection with this change").

[68] *See Lachman*, 487 F. Supp. 3d at 128 (failing to disclose "losses suffered as a result of [software] launch" inactionable where challenged disclosures pre-dated launch); *Shemian*, 2013 WL 1285779, at *21 (plaintiffs failed plausibly to allege defendants could have been aware of "technical difficulties that would plague" product "post-launch" when disclosures were made pre-launch).

even if the CW allegations were to be credited, they plead only that various complications arose at some unspecified point "after" Arrow's core conversion,[69] which, without additional specificity, could mean *any* time "after" mid-September 2022.  At bottom, plaintiffs "fail[] to allege any particularized facts supporting the conclusion that defendants knew or had access to information that . . . permitted them to expound upon these issues earlier than they did."[70]

### 2.    The March 16, 2023 Form 12b-25 and March 31, 2023 Form 12b-25/A

The AC also attacks Arrow's announcements that it would be unable timely to file its 2022 Form 10-K for allegedly (i) omitting that Arrow would be unable timely to file its Form 10-Q for the quarter ending March 31, 2023, thus increasing the risk that Arrow would be de-listed by NASDAQ and (ii) "downplay[ing] the severity of its defective disclosure controls and procedures and internal controls over financial reporting."  (AC ¶ 110.)  These allegations fail.

Plaintiffs ignore that the Forms 12b-25 and 12b-25/A each warned that Arrow's Form 10-Q filing could be untimely, cautioning that Arrow's ongoing assessment of internal controls could adversely affect "the Company's ability to file . . . *future SEC reports* on a timely basis." (Ex. F, Part III; Ex. G, Part III.)  To the extent Plaintiffs contend Arrow should have stated with certainty that it would be unable, months later, timely to file its 10-Q for the first quarter of 2023 (which had not even closed yet), that claim fails because the AC is bereft of allegations

---

[69] *See, e.g.*, AC ¶¶ 50 (problems arose "after the core conversion"), 52 (erroneous alerts were generated "after the conversion"), 59 ("Arrow didn't learn that [loans were categorized differently in the two systems] until it converted to the new system."), 70 (alleging Arrow failed to "report its financials on time following the core conversion"), 72 ("Arrow only became aware of" errors to report 1099 forms "when customers began to complain" in advance of January 1, 2023 deadline), 75 (dispute report tests "kept failing after the conversion").

[70] *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 794 (S.D.N.Y. 2013); *see also* n. 65, *supra*.

that the Defendants *knew* (and could disclose) in March 2023 that the Form 10-Q filing would be delayed.[71]

As for the contention that Defendants allegedly "downplayed" Arrow's control deficiencies, both the disclosures themselves and subsequent events are to the contrary.  The March 16 Form 12b-25 made clear that Arrow and its management required "additional time to complete the assessment of the effectiveness of internal controls," delaying the outside auditor's audit procedures (AC ¶ 104 (quoting Ex. F, Part III),) and warned investors that there could be "no assurance" the issues could be remedied in time to file within the regulatory extension period.  (*Id.* ¶ 106 (quoting Ex. F, Part III).)  After two weeks' investigation, the Company disclosed in its amended Form 12b-25 that it had "identified and expect[ed] it will disclose deficiencies in [its] internal controls."  (*Id.* ¶ 107 (quoting Ex. G, Part III).)  Arrow described in detail the deficiencies it had so far uncovered—including "the failure to design and maintain [i] an effective risk assessment process . . . [ii] effective monitoring activities relating to . . . management oversight over the internal control evaluation process . . . [and] assessing and communicating the severity of identified deficiencies in a timely manner" and "the design and execution of controls with respect to the Company's core system"—and warned that management's ongoing assessment could "conclude that these or other deficiencies may be determined to be material weaknesses."  (*Id.*)  Plaintiffs do not explain how this in-depth *mea culpa* soft-pedaled the severity in the defects of Arrow's controls, much less how the Defendants were in possession of contrary facts that should have been disclosed.

---

[71] *City of Taylor Gen. Emps. Ret. Sys.*, 967 F. Supp. 2d at 794 ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").  See also cases cited in n. 65, *supra*.

Curiously, the AC also appears to challenge two opinion statements from the March 31, 2022 Form 12b-25/A that were indisputably well-founded:

- "[T]he Company does not expect any material change to the financial results included in the [forthcoming 2022 10-K] compared to those included in the Company's earnings press release furnished to the Securities and Exchange Commission under the Company's Current Report on Form 8-K filed January 30, 2023"; and

- "[T]he Company does not expect that the identified deficiencies will result in material misstatements or omissions in its previously reported financial statements or that the Company will have to restate its previously reported financial information."

(*Id.* ¶ 107 (quoting Ex. G, Part III).)  These statements turned out to be on the mark.  Arrow's financial results in its 2022 Form 10-K were identical to those it had included in its January 30, 2023 Form 8-K.  (*Compare* Ex. K at 28–29, 55–60 *with* Ex. O at 1, 6–11.)  And when Arrow and its auditors completed the investigation into the internal control deficiencies, there was no restatement of its previously reported financial results.  (Ex. K at 17.)

### 3.     The April 5, 2023 Form 8-K

Similarly, Arrow timely disclosed its receipt of a notice of noncompliance from NASDAQ.  (*See* AC ¶ 109 (quoting Ex. H, Item 3.01).)  That disclosure explained the process under NASDAQ rules—which included the submission of a plan for Arrow to become compliant with NASDAQ's rules, a potential extension of up to 180 days to execute on that plan—and warned that there could be "no assurance that NASDAQ will accept the Company's plan . . . or that the Company will be able to regain within any extension period granted by NASDAQ," which could result in "the Company's shares of common stock . . . be[ing] subject to delisting from NASDAQ."  (*Id.*)  Plaintiffs do not explain what, precisely, was allegedly misleading about this description, except to allege counter-factually that it somehow failed to disclose that "Arrow was at an increased risk of being delisted from the NASDAQ."  (*Id.* ¶

110.)  Where, as here, the allegedly misleading statement actually disclosed the allegedly

omitted information, there can be no claim for securities fraud.[72]

4.    *The May 11, 2023 Form 12b-25*

The AC also maintains that Arrow's May 11, 2023 announcement that it would unable

timely to file its first quarter 2023 Form 10-Q was materially misleading because, like the

earlier Forms 12b-25, it omitted that Arrow was at an increased risk of NASDAQ delisting and

downplayed the severity of the Company's internal control deficiencies.  (*See* AC ¶ 114.)  But

the AC fails to explain how the challenged statements were materially misleading:

- "The Company is working diligently to complete the Assessment and file the [2022 Form 10-K] and the [1Q23 10-Q] as soon as practicable."  (AC ¶ 113 (quoting Ex. I, Part III).)  The AC nowhere alleges that Arrow was *not* "working diligently to complete" its assessment or to file its untimely financial disclosures as soon as it could. Indeed, the AC acknowledges that Arrow ultimately did so.  (*Id.* ¶ 93; *see also* Exs. K, L.)

- "Once the Company completes the Assessment and files the [2022 10-K], the Company will promptly complete and file the [1Q23 10-Q] as soon as practicable."  (AC ¶ 113 (quoting Ex. I, Part III).)  Again, this is precisely what happened.  (*See* Exs. K, L.)

The AC fails to explain how the failure to disclose an "increased risk" of delisting from the

NASDAQ renders these indisputably accurate statements misleading, especially in light of the

detailed description of the NASDAQ process and de-listing risk in the April 5, 2023 Form 8-K.

**C.    Messrs. Campanella and Ivanov Cannot Be Liable for Statements Made When They Did Not Work for Arrow.**

The AC concedes that Mr. Campanella resigned from Arrow effective September 30,

2022 (AC ¶ 79), and that Mr. Ivanov did not join Arrow until February 21, 2023 (*id.* ¶ 25), yet

---

[72] *See, e.g.*, *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (statement that "directed investors to the relevant Internal Revenue Code provisions" not misleading for omitting alternative minimum tax applicability); *Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, 2020 WL 6063539, at *5 (S.D.N.Y. Oct. 14, 2020) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed.") (cleaned up).

Plaintiffs allege that each of the Defendants is liable for all the challenged statements, regardless of whether each was then-employed by Arrow. But a corporate executive can be liable only for statements made when the executive was employed by the company.[73] Thus, even if the AC adequately stated claims, Mr. Campanella could be liable only for statements in the August 6, 2022 Form 10-Q, the only allegedly misleading statement before his departure. And Mr. Ivanov could be liable only for statements post-dating his February 21, 2023 hiring.

## III.   ABSENT A PRIMARY VIOLATION, THERE CAN BE NO CONTROL PERSON LIABILITY.

Because the AC fails to allege a primary violation, its control person claims against the Individual Defendants should be dismissed.[74]

## CONCLUSION

The AC fails to plead the most fundamental aspects of a securities fraud claim—a misleading statement made with scienter. It attempts to substitute speculative, conclusory, hearsay (and often self-contradictory) CW allegations for the particularized pleading Congress mandated in the PSLRA. Stripped of those defective allegations, the AC pleads nothing more than fraud by hindsight. Indeed, the AC's allegations give rise to the far more cogent and compelling inference that Arrow and its officers identified concerns with its internal controls after the core conversion, timely disclosed those concerns to investors, told investors that the Company's investigation was continuing, and continued timely and candidly to update the markets as Arrow's investigation continued and uncovered more information. The AC should be dismissed with prejudice.

---

[73] *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 762 (S.D.N.Y. 2017) (former CEO not liable for statements issued after leaving his position).

[74] *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 382 (S.D.N.Y. 2007).

Dated: February 9, 2024
      New York, NY

Respectfully submitted,

/s/ *William J. Sushon*

William J. Sushon (Bar Number: 704744)
Javed S. Yunus (Bar Number: 704749)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York  10036
(212) 326-2000
wsushon@omm.com
jyunus@omm.com

*Attorneys for Defendants*